# UNITED STATES *v.* SANTA FÉ.

APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 208.   Argued January 7, 8, 1896. — Decided March 1, 1897.

The Spanish law did not, *proprio vigore*, confer upon every Spanish villa or town, a grant of four square leagues of land, to be measured from the centre of the plaza of such town.

Although, under that law, all towns were not, on their organization, entitled by operation of law, to four square leagues, yet, at a time subsequent to the organization of Santa Fé, Spanish officials adopted the theory that the normal quantity which might be designated as the limits of new pueblos, to be thereafter created, was four square leagues.

The rights of Santa Fé depend upon Spanish law as it existed prior to the adoption of that theory.

An inchoate claim, which could not have been asserted as an absolute right against the government of either Spain or Mexico, and which was subject to the uncontrolled discretion of Congress, is clearly not within the purview of the act of March 3, 1891, c. 539, creating the Court of Private Land Claims; but the duty of protecting such imperfect rights of property rests upon the political department of the government.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Dickinson* and *Mr. Matthew G. Reynolds* for appellants.

*Mr. T. B. Catron* and *Mr. William H. Pope* for appellee.

MR. JUSTICE WHITE delivered the opinion of the court.

This case comes on appeal taken by the United States from a decree of the Court of Private Land Claims confirming to the lot holders in privity with the city of Santa Fé the lots held by them in severalty in that city, and confirming to the city itself in trust for the use of its inhabitants a tract of four square leagues claimed by the city, except mines of gold, silver and quicksilver, and property appropriated, used, occupied, possessed or owned by the United States.

It is conceded or shown that prior to 1680 there existed a Spanish town known as La Villa de Santa Fé, which was the seat of government of the Spanish province of New Mexico, and that there was also prior to that date the official mechanism required by the Spanish law to direct the affairs of a Spanish villa or town. The origin of the town or villa is obscure, but the record indicates that as early as 1543 the settlement was made by deserters from the Spanish military force under Coronado, who refused to accompany their commander on his return to Mexico, and settled at Santa Fé. In 1680 the Spaniards were driven out by an Indian insurrection and Santa Fé was destroyed, the Spaniards retreating to Paso del Norte, where they remained until 1692, when Diego de Vargas reconquered the country. In 1693 de Vargas reëstablished Santa Fé. From that time to the American occupation — although the record does not fix the precise character of the municipal government — there is no doubt that there was a settlement on the site of the old villa of Santa Fé, and that it was also the capital of the province. In 1851 Santa Fé was incorporated and its boundaries defined by act of the territorial legislature of New Mexico. Laws of New Mexico, 1851–52, Kearney's Code, 112. The municipal charter granted in 1851 was shortly thereafter repealed, and the probate judge of the county became, by operation of law, the custodian of the records of the corporation and was a trustee to wind up its affairs. Laws of New Mexico, 1851–52, Kearney's Code, 272. No municipal body existed from this time until the year 1891, when Santa Fé was again organized pursuant to the laws of New Mexico.

Under the eighth section of the act approved July 22, 1854,

c. 103, 10 Stat. 308, the probate judge of the county of Santa Fé presented to the surveyor general of New Mexico a claim on behalf of the city for four square leagues of land. This claim was substantially based upon the averment that as the city of Santa Fé was in existence during the whole period of Spanish sovereignty over New Mexico, it was certain that "under the Spanish laws, usages and customs the inhabitants thereof were, as a community, entitled to receive, and your petitioners believe and claim did in fact receive, a grant from the crown for at least four square leagues of land and commons which they now claim." As the legal authority for this asserted right of the city, reference was made to specified provisions of the law of Spain, and the prayer of the petition was "that said land be surveyed, and that a patent therefor be issued by the United States, to the probate judge for the time being of said county of Santa Fé, in trust for the use and benefit of the landholders and inhabitants within said tract, and for the city of Santa Fé until the same be by law incorporated under charter, and thereby become the rightful custodian of the patent for said tract of land." The surveyor general reported to Congress for confirmation the claim thus made (H. of R. Ex. Doc. 239, 43d Congress, 1st session), and the recommendation not having been acted upon, this suit was commenced, by the city of Santá Fé, under the provisions of the act of March 3, 1891, creating the Court of Private Land Claims. 26 Stat. 854, c. 539.

The petition originally filed on behalf of the city, after setting out the existence of the Spanish villa known as La Villa de Santa Fé, substantially averred that the municipality of Santa Fé occupied the situs of the Spanish villa and possessed jurisdiction over the same territory, and, therefore, was, in law, the successor to all the rights enjoyed by the Spanish villa. It alleged that, prior to the Indian insurrection in 1680, the villa had received a pueblo grant of four square leagues of land, the central point of which was in the centre of the plaza of the city of Santa Fé; that the grant was made by the King of Spain; that juridical possession was given thereunder, and that such facts were evidenced by a valid *testimonio;* that

the archives and records of the villa were destroyed in the Indian insurrection of 1680, and, therefore, the title could not be produced. The fact was also averred that the claim had been submitted to the surveyor general, and had been by him recommended favorably to Congress. The prayer was for a confirmation of the grant to the city "in trust for the use and benefit of the inhabitants thereof, and of such grantees and assignees of parts of the said lands as have derived, or may hereafter acquire by due assignments, allotments and titles in severalty to said parts respectively." The defendant demurred on the ground that the petition stated no cause of action, and also because it failed to disclose the fact that there were many adverse claimants, under Spanish grants, to the land sued for, and that such claimants were necessary parties defendant.

Appearances were thereafter filed by seventeen persons, alleging that they were the holders of Spanish titles to land within the area claimed, and that their interests were, therefore, adverse to those of the city. Thereupon an amended petition was filed by the city, which in its caption mentions as defendants not only the original defendant, the United States, but the seventeen persons who had made appearance as having adverse interests. This amended petition substantially reiterated the averments of the original petition as to the foundation and existence of the villa of Santa Fé, but omitted the allegations on the subject of an express grant to La Villa de Santa Fé, the delivery of juridical possession thereunder and the issuance of a *testimonio*. The allegation on these subjects was that prior to the insurrection in 1680, "La Villa de Santa Fé was entitled to, and had under the laws of the kingdom of Spain in force in that territory at that time, a municipal or pueblo grant, conceding to and vesting in said Spanish town or villa a certain tract of land containing four square Spanish leagues." The positive averment in the original petition as to the destruction during the insurrection of 1680 of the evidence showing the existence of an express grant was replaced by a qualified averment that "all the muniments of title of such municipal grant, *if any such existed*, were utterly destroyed by the hostile Indians engaged in such insurrection."

The amended petition also averred that within the boundaries of the grant claimed there "are now living about seven thousand people, and about fifteen hundred heads of families, nearly all of whom own, occupy and have improved lands which they claim to hold under the said grant to the Villa de Santa Fé, and there is erected thereon buildings and improvements in public and private ownership, claiming under said grant to the value of several millions of dollars, and that none of said claimants and occupants are in any sense adverse claimants to your petitioner. And your petitioner further shows that there are claimed to be certain private land grants to individuals named as defendants in this proceeding, of tracts of land within the exterior line of said four square leagues granted to your petitioner as aforesaid. But your petitioner avers that if any such exist each and all of them are junior in date, subordinate and subject to the said municipal grant to your petitioner's predecessor as a town and villa, and whether the said private land grants are claimed adversely to your petitioner or not, your petitioner is not advised, but it states that all of said private land grants have been filed before this court for adjudication and have already been set for hearing in this court for the same date as this case, and that all of said claimants have subjected themselves to this court, with their alleged private land grants for its determination and decision, when the matter of their interests as against those of your petitioner can be fully and finally determined."

The answer of the United States denied the alleged facts as to the foundation and organization of La Villa de Santa Fé; denied that the plaintiff, a municipal corporation, existing under the laws of New Mexico, was the successor or entitled to assert the rights, if any, of the Spanish villa; it also denied that the Spanish villa had received title to or was by operation of the Spanish law entitled to claim the four square leagues of land; averred that title to a large portion of the land embraced within the four square leagues was claimed under Spanish grants by others than the plaintiff, the validity of which claims was not, however, admitted, and that other portions of the four square leagues were in control, occupancy

and possession of the United States for a military post, known as Fort Marcy, for a building known as the "Federal building," and for an establishment known as the Indian Industrial School, and that another portion was in possession of the territorial executive officers under the authority of the United States.

The persons holding conflicting grants, who were made defendants, also filed answers specially denying the making of the Spanish grant to La Villa de Santa Fé, or the right of that villa to a grant of four square leagues by operation of the Spanish law. It was moreover specially denied that the heads of families, residents or other persons who occupy or own house lots or lands in the city of Santa Fé, claim to hold the same under the alleged grant of the villa of Santa Fé, whether express or implied, and specially denied that the holders of lots in the city of Santa Fé were not adverse to the claim asserted by the city to the four square leagues. It was moreover alleged the various grants, eighteen in number, alleged to have been made by the Spanish authorities to the respective parties, averred their conflict with the asserted rights of the city, and prayed that as such claims had been filed and had been previously presented to the court, they be considered and approved, and that the claim of the city be rejected. The issues made up by these pleadings were tried. In the opening of the trial the counsel for the plaintiff made the following statement:

"After consultation with most of the counsel for the city, the disposition seems to be to respect the claims of the United States, either under its original disposition or under its purchases from private individuals. There is no disposition to deny the right of the United States to those properties which it has occupied since the change of sovereignty; we are willing to concede that to the United States attorney."

"I desire to make a statement to the court as to what our evidence is to be, and as to how we are claiming we are entitled to the grant under which we claim to represent here. Our claim is analogous to the claim made in the city of San Francisco case, and is analogous to the claim which is known as the Brownsville, Texas, claim. If the court please, we claim our grant on, not so much as to the existence of papers of title,

or documentary evidence, but through operation of law, as was claimed and held in the case of the town of Albuquerque, which this court has already decided, and as was held in San Francisco and town of Brownsville, Texas. The case of the city of San Francisco was decided by the Supreme Court of the United States after the city of San Francisco produced evidence sufficient to show that it was a corporation under the Mexican and Spanish governments; that as such corporation it possessed an ayuntamiento and other city officials which belonged to it; and on this evidence the court presumed and said it was entitled to four square leagues. It was so held in the town of Brownsville, and was so decided by this honorable court in the town of Albuquerque against the United States, case No. 8.

"In our case we expect to show that we had an existence in the year 1680, and that as far back, at least, as 1704, we had a corporate existence, and that as having such corporate existence, and having duly constituted officials, an ayuntamiento and alcalde of that corporation, that this court will presume that we are entitled to four square leagues of land, to be measured from the centre of the plaza of this town.

"In regard to these adverse claims presented here, I do not just now desire to call the attention of the court to what we think is the law fixing their rights. I will, however, say that we will combat the idea that the governors of this territory had any power to make grants within the exterior boundaries of the Santa Fé grant; whether they have been made I do not pretend to admit, and we will combat the idea that they were made through lawful authority by the persons granting them."

The proof established the settlement and organization of the city of Santa Fé in accordance with the facts already stated. The various grants referred to in the answer of the several defendants were offered in evidence and testimony adduced tending to show that they covered territory embraced within the claim to the four leagues, and were, therefore, adverse to the claims of the city.

There was no evidence whatever introduced showing that

La Villa de Santa Fé, in any of its forms of organization under the Spanish government, or that the city of Santa Fé itself, had ever possessed the four square leagues to which it asserted title, or that any lotholder in the city claimed to own or hold by virtue of any title derived under the supposed right of the city. Indeed, there was an entire absence of any proof showing that any right by possession or otherwise within the area claimed was held under or by virtue of the implied grant of four square leagues, upon which the city relied. On the contrary, there was proof that in 1715 the city of Santa Fé petitioned for a grant of a tract of swamp land situated within the boundaries of the four square leagues, to which it now asserts title by operation of law, and that this prayer was granted.

The judgment of the court, which allowed the claim of the city, with the reservations and conditions stated in the opening of this opinion, rejected the claims of the defendants who appeared and asserted the various adverse Spanish grants, so far at least as they were in conflict with the claim of the city to which we have referred. As, however, the United States has alone appealed from the decree in favor of the city, we are concerned on this appeal only with the issues which arise between the United States and the city of Santa Fé.

The fundamental question in the case is, did the Spanish law, *proprio vigore*, confer upon every Spanish villa or town a grant of four square leagues of land to be measured from the centre of the plaza of such town. The claim that the law of Spain conferred such right is based on certain provisions of that law applicable to the possessions of that government on this continent, and which are to be found in a compilation promulgated in 1680, and known as the "Recopilacion de las Indias."

The compilation itself is thus described by Schmidt in his treatise on the Civil Laws of Spain and Mexico, who says (p. 94):

"The method adopted in this code is the same as that pursued in the Nueva Recopilacion of the Laws of Spain. It is divided into nine books, comprising two hundred and eighteen

titles, which contain six thousand four hundred and forty-seven different legal enactments, all of which, derived from the orders, decrees and regulations of different sovereigns, and often temporary in their character, are dignified with the title of laws. Hence, there is found united in this compilation many laws on the same subject, in which the preceding law is only repeated, others in which it is modified, and still others in which it is abrogated, either in whole or in part. The veneration of the compilers for laws which once had received the royal sanction seems to have been so great, that they did not consider themselves at liberty to omit them. This mode of proceeding has swelled this code to its present dimensions, when, if a more rational method had been adopted, it could readily have been compressed into one third of the space it actually occupies."

The reliance of the city of Santa Fé is — first, on the text of the Spanish law; second, on the contention that if there be ambiguity in the text, the right of the city to the four square leagues results from a construction given to the Spanish law in proceedings with reference to the claim of the city of San Francisco to a grant of land and from acts of Congress in relation to such claim; and, third, upon the contention that the interpretation of the Spanish law upon which the city bases its right is sanctioned by previous adjudications of this court. We will examine these propositions in the order stated.

First. *The Spanish law relied upon.*

The only provisions of the Recopilacion, to which we are referred as sustaining the claim of the city, are laws 6, 7 and 10, of title 5, book 4, which are found in 2 White, New Recopilacion, pp. 44 and 45. They read as follows:

Law 6. "If the situation of the land be adapted to the founding of any town to be peopled by Spaniards, with a council of ordinary alcaldes and regidores; and, if there be persons who will contract for their settlement, the agreement shall be made upon the following conditions: That, within the prescribed time, it shall comprise at least thirty heads of families, each of whom to possess a house, ten breeding cows, four

steers, or two steers and two young bullocks, a breeding mare, a breeding sow, twenty breeding ewes from Castile, and six hens and a cock; he shall, moreover, appoint a priest to administer the sacraments, who the first time shall be of his choice, and, afterwards, according to our royal patronage: he shall provide the church with ornaments and articles necessary for Divine worship; and he shall give bond to perform the same within said period of time; and if he fail in fulfilling his agreement, he will lose all that he may have built, worked or repaired, which shall be applied to our royal patrimony, and incur the forfeiture of one thousand ounces of gold to our chamber [camera]; and if he should fulfil his obligations, there shall be granted to him four square leagues of territory, either in a square or lengthwise, according to the quality of the land, in such a manner, that, when located and surveyed, the four leagues shall be in a quadrangle, and so that the boundaries of said territory be at least five leagues distant from any city, town or village, inhabited by Spaniards, and previously settled, and that it cause no prejudice to any Indian tribe, nor to any private individual."

Law 7. "If any one should propose to contract for a settlement, in the prescribed form, to consist of more or less than thirty heads of families, provided it be not below ten, he shall receive a grant of a proportionate quantity of land, and upon the same conditions."

Law 10. "Whenever particular individuals shall unite for the purpose of forming new settlements, and among them there shall be a sufficient number of married men for that purpose, license may be granted to them, provided there be not less than ten married men, together with an extent of territory proportioned to what is stipulated; and we empower them to elect, annually, from among themselves, ordinary alcaldes and officers of the council."

Law 6 as we have quoted it from White's work varies from the translation of Reynolds in his work on Mexican Law, the latter version, instead of saying that the land "shall be granted," being, that it "may be given." No importance, however, is to be attached to this difference, since it is evi-

dent from either translation of the law, as a whole, that it was optional and not obligatory on the representative of the King to enter into the contracts which the law authorized to be made. It is apparent also from the text of these laws that they provided solely for the allotment of lands for the purpose of a settlement to be made under contract, and on the performance of certain conditions; in other words, that these laws delegated authority to contract for certain specific quantities of land to accomplish the particular results which the laws contemplated. The effect of law 7 was to forbid contracts for the establishment of towns unless the settlement was to be made by ten persons, and to vary the amount of land to be granted according as the number of heads of families might exceed ten and be less than thirty, which latter is treated by law 6 as being normally required for a contract settlement. Looking at the text of the laws, it is difficult to understand upon what theory the claim is advanced that every Spanish town, whether settled under contract or not, was entitled to four square leagues. It cannot be denied that this quantity of land was not the right of every town settled under contract, since the amount varied with the number of heads of families with whom the contract was made and who were to constitute the settlement.

The argument however is pressed that law 10 embraces all towns not settled under contract, since it says " whenever particular individuals shall unite for the purpose of forming new settlements." From this expression is deduced the proposition that as the provisions for contract related to settlements of towns made by a particular contractor, therefore they were inapplicable to settlements made by individuals united for that purpose, in which latter case it is claimed the right to the land arose, not by virtue of a contract, but by operation of law. Granting for argument's sake the correctness of the contention, it fails to justify the claim of the city, because law 10 does not specify the quantity of land to be enjoyed by a settlement made by individuals uniting for the purpose of settling a new town ; but simply says that they shall have an extent of territory " proportioned to what is stipulated."

This reference to what is stipulated must either be to the requirements of laws 6 and 7, or to some other regulation on the subject. If it relates to laws 6 and 7, then it would necessarily subject individuals uniting to form a settlement to the terms of laws 6 and 7, and therefore render it necessary that the right to land should arise from contract. Indeed, the argument in favor of the claim of the city logically leads to the inconsistent position that laws 6 and 7 are read into law 10 for the purpose of the quantity of land to be granted, and are read out of that law in so far as the prerequisite necessity of a contract is concerned.

But reference to the ordinances of Philip II (promulgated more than one hundred years prior to the Recopilacion), in which law 10 was found, makes its meaning perfectly clear, and demonstrates that the construction now sought to be given law 10 has no other foundation than the confusion in compiling the Recopilacion, of which we have made mention in citing the language contained in the treatise of Schmidt on the subject. Thus, in the ordinance of Philip, law 6 of title 5, book 4 of the Recopilacion was numbered as ordinances 88 and 89. Following those ordinances down to 99 inclusive are various provisions regulating contract settlements. Then comes ordinance 100, which is now law 7 above referred to. The next ordinance (101) is identical with law 10. Ordinances 102 and 103 (now law 20, book 4, title 7; law 9, book 4, title 5, and law 21, book 4, title 7, of the Recopilacion) read as follows:

Law 20, book 4, title 7:.

"A contract having been made under the authority of a colony, a governor, an alcalde mayor, a mayor, a town or village, the council and those who made the same in the Indies shall not be satisfied with having accepted and made the contract, but shall continue to control it and direct how it shall be carried into effect, and shall keep a record of all that is being done."

Law 9, book 4, title 5:

"In contracts for new settlements made by the government, or whoever shall be thereto authorized in the Indies, with cities, adelantado, superior alcalde or corrigidor, the

person entering into the agreement shall do so likewise with each individual who may enlist to join the settlement; and he will bind himself to grant building lots in the new settlement, together with pastures and lands for cultivation in a number of peonias and caballerias proportionate to the quantity of land which each settler shall obligate himself to improve; provided it shall not exceed, nor shall he grant more to each than five peonias or three caballerias, according to the express distinction, difference and measurement prescribed in the laws of the title concerning the distribution of lands, lots and waters."

Law 21, book 4, title 7:

"We direct that the governor and the magistrate of the town newly settled, *ex officio,* or on petition of a party, shall require the fulfilment of the contract with due diligence and care by all of those who may be bound to make new settlements, and the council and the corporation attorneys shall appear by petition against such settlers as have not fulfilled their contracts within the term agreed upon, in order that they be compelled, with all rigor of law, to carry out that which was stipulated, and that the judges shall proceed against those who may be absent, and that they be arrested and brought to the settlements, and that requisition be made for those who may be in other jurisdictions, and all judges shall grant them under penalty of our displeasure."

This retrospect at once demonstrates that the rights acquired under law 10 depended upon contract and could only arise therefrom, since that law was but one provision of a system providing for grants under contract alone. To illustrate, reviewing the provisions in the order in which they stood before their confused compilation in the Recopilacion, ordinances 88 and 89 (law 6) and ordinance 100 (law 7) provided for contracts with an individual for founding a town, for the quantity of land to be contracted for, and prescribed regulations for the new settlement. Ordinance 101 (law 10) provided for individuals uniting for the purpose of a settlement. Ordinance 102 (law 20, book 4, title 7) also in this latter case treated a contract with such united individuals or

colony as a necessary prerequisite, and the subsequent provisions ordain rules for the government of these settlements and the enforcement of the obligations arising under the contracts.

Various provisions in the Recopilacion moreover clearly establish that the power to make contracts for settlements, whether with one contracting person or with a community of individuals, was not unrestrained, and was subject to exception.

Thus law 6, book 4, title 7, provided as follows (2 White, New Recop. p. 46):

"No tract of land for new settlements shall be granted or taken by agreement in any seaport; nor in any part which might, at any time, be prejudicial to our royal crown or to the republic, our will being that they be reserved to us."

The same law is thus translated in the appendix to the brief for the government:

"Land and term for a new settlement shall not be granted or taken under contract in seaports, nor at any place where at any time damage may result to our royal crown or the community, because it is our will that they be reserved for us."

The object of these provisions was clearly not only to prevent contracts as to seaport settlements, but also such contracts as to places where it might be prejudicial to make grants of land, although there might be general authority to that end.

It may well also be implied from the provisions in the Recopilacion that the right of a town to hold land for public purposes was required to be evidenced by a grant from the viceroy or governor, and that such grant when made required confirmation by the crown. Thus, law 1, title 13, book 4, of the Recopilacion (2 White, New Recop. p. 55), is as follows:

"The viceroys and governors, being thereto authorized, shall lay out for each town or village which shall be newly founded and peopled, the lands and lots which they may want, and the same shall be granted to them as reservations [propios] without prejudice to third persons. They shall transmit to us information of what they shall have laid out, that we may order the same to be confirmed."

Whilst it may be that the necessity for confirmation was dispensed with at some date, much later than the establishment of Santa Fé, there is no question that this provision was in force at the time when it is claimed that the settlement came into existence as a Spanish town.

The theory, then, of the vesting by operation of law in every Spanish town at the time of its organization, of a title, to four square leagues of land, finds no support in the text of the Spanish laws, and is repugnant to their general tenor, as it is in direct conflict with mandatory provisions of that law exacting a grant and its confirmation. Of course, the existence of power to make contracts for settlements in particular cases cannot be held to have deprived the proper authorities of the right to make grants in other cases where a general power to that effect was possessed. There are various texts of the Recopilacion showing not only that the Spanish crown itself by its supreme authority contemplated the making of gifts of land to individuals, but also that such gifts were expected to be made for the purpose of the settlement of towns where there was originally no contract therefor, either with colonies or with a particular contractor. To avoid prolixity as far as possible, we do not quote the text of the laws on this subject, contenting ourselves with establishing the existence of the power by showing some instances where it was undoubtedly exercised. The petition for and grant made to Santa Fé itself of the tract of swamp land, to which we have called attention, is one of such instances. We find in the record the petition of one Juan Lucero de Godoy, dated El Paso, January 15, 1693, addressed to the governor and captain general, and reciting, in substance, that, prior to the insurrection of 1680, he had taken up his residence in Santa Fé and received a grant of land, and praying for a regrant of the land, part of which was situated within the area of four square leagues to which the city now asserts title. There is also a recognition of the exercise of this power referred to in *Chouteau* v. *Eckhart,* 2 How. 344, where it appears that the village of St. Charles applied for an enlargement of its commons, and that the Spanish governor replied that the intendant of the province

must make such grant, but that he would provisionally allow the town to occupy the land prayed for. So, in *Lewis* v. *San Antonio*, 7 Texas, 288, it was shown that there had been an express grant, and that the boundaries had been duly marked and laid out covering six square leagues. But the concession that there was a power in the Spanish crown or its authorized officers to make grants of land, when considered by them to be proper, would not justify a holding that the authorities must have deemed it imperative to make a grant of a definite quantity to every town when established, no matter under what circumstances it was founded. To so conclude would amount to saying that it was the duty of the United States after the cession by Mexico, of the territory covered by the treaty, to presume, because the Spanish officials had the power to make grants, that they had actually exercised it in favor of every town and every individual within the territory ceded. If we were to make so preposterous an assumption the task would yet remain of determining how much land it would be presupposed had been given because the power to give existed in each case, a duty impossible of performance.

If, however, it were conceded, in plain violation of the letter of the Spanish law, that every town was entitled to a grant of land by operation of law, the quantity to which the town would be entitled would remain wholly undefined and undetermined, and would have, if allowed by inference, to be created by an arbitrary exercise of judicial power. Plainly, from the provisions of the Recopilacion, the quantity varied with the condition of the respective settlements, and to imply a grant of land to the extent of four square leagues in every case would be to suppose that every settlement was alike, whilst the law itself contemplated that they would be different and subject to different allowances. This consequence is shown by a statement in the treatise of Hall on Mexican Law, where it is said, sec. 117, p. 51:

"Limits of Pueblos. — There never existed any general law fixing four square leagues as the extent of pueblos or towns. That extent of land was assigned to pueblos founded by contractors for Spaniards, by law 6, title 5, book 4, of the

laws of the Indies. Those formed by the government, independent of contractors, were only limited by the discretion of the governors of the provinces, and viceroys, subject to approval or disapproval of the King. There are numerous pueblos in Mexico which have less and many that have more than four square leagues."

And in section 118, the same author declares that the jurists of Mexico are unacquainted with any such provision of Spanish jurisprudence as that four square leagues should be the superfice of pueblos.

These facts as to the condition of things in Mexico are in accord with the claims to land made against the United States under the law of Spain by villages and towns in Florida and Missouri, to which we shall hereafter take occasion to refer more particularly.

As the right which the city asserts is devoid of every element of proof tending to show a possession coupled with claim of title, but rests upon the mere assumption of a right asserted to have arisen by operation of law hundreds of years ago, of course there is no room for the application of a presumption of an actual grant, within the doctrine declared in *United States* v. *Chaves*, 159 U. S. 452. Even did the case present a claim of express grant, proof of the existence of which rested on presumptions arising from acts of possession, etc., there are many circumstances attending the history of Santa Fé and the nature of its establishment, which we have heretofore recited, which would strongly tend to rebut the presumption. The town was, it would seem, originally a colony of deserters from the Spanish army which was located in the midst of the native Indians; it became afterwards the capital seat of the province and a fortified town, and was presumably, in its permanent creation, the outcome and development of the success of the Spanish arms, rather than of the exercise of the power to induce settlements by contracts with individuals or otherwise. It is impossible, on the theory of the petitioner, to explain the petition presented by the city to the Spanish governor, in 1715, for a concession of a tract of swamp land situated within the four square leagues now claimed,

for if. the right to the entire four square leagues then existed it was complete. At the time of this petition, if the claim here advanced had any foundation or was deemed by any one to exist, such fact would of course have been then known and have rendered the petition for the grant of the swamp wholly unnecessary.

We now proceed to examine the next proposition advanced to support the claim of the city of Santa Fé, which is as follows:

Second. *Whatever, as an original question, may be the correct interpretation of the Spanish law, the right of every town to four square leagues of land under that law is no longer a subject of controversy, but is concluded in favor of such right by. the report of the board of land commissioners, which passed upon the claim of San Francisco, by the decision of the Circuit Court of the United States on the same subject, by the persuasive force of certain decisions of the Supreme Court of California, referring to the title of San Francisco, and finally by the action of Congress on the subject.*

The history of the San Francisco claim, however, does not justify the contention thus urged. The pueblo of San Francisco, in the first place, was not a Spanish but a Mexican town, and its claimed rights were asserted to have been obtained from the supreme government of Mexico. Thus, as stated in the report of the board of land commissioners, the petition alleged (Dwinelle, Colonial History of San Francisco, App. p. 121) "that in pursuance of the laws, usages and customs of the government of Mexico, and an act of the departmental legislature of California of the ninth of November, 1833, (1834) and proceedings in pursuance thereof, the pueblo of San Francisco was duly created and constituted a municipal corporation, with a municipal government, and with all the rights, properties and privileges of pueblos under the then existing laws, during the said year 1833, (1834); and that there was then and there, by the supreme government of Mexico, in the manner by law prescribed, ceded and granted to the said pueblo for town lands and for common lands, all and singular the premises described in their said petition."

It may be conceded *arguendo* that there was in force at the
time the pueblo of San Francisco was established laws of the
government of Mexico and regulations based thereon expand-
ing the law of Spain so as to entitle a newly established
pueblo to have measured off and assigned to it by officers of
the government four square leagues of land, without in any
way implying that such right existed under early Spanish
laws. The necessity for action by Congress in the case of
San Francisco was produced by various causes, such as grants
made by the officials of the pueblo while San Francisco was
part of the territory of Mexico, and grants which purported
to have been made after the occupation of the town by the
forces of the United States by persons claiming to be the law-
ful successors of such Mexican officials. For these reasons,
there was great confusion and uncertainty in the titles to land
in the city. By the act of March 3, 1851, c. 41, 9 Stat. 631,
Congress created a board of land commissioners to determine
claims to land in California asserted " by virtue of any 'right'
or 'title' derived from the Spanish or Mexican government."
Section 14 of that act permitted the claims of lotholders in a
city to be presented in the name of such city, *and authorized the
presumption of a grant to a city which was shown to have been
in existence on a date named.* The section is found in full in
the margin.[1]

---

[1] SEC. 14. *And be it further enacted,* That the provisions of this act shall
not extend to any town lot, farm lot or pasture lot, held under a grant
from any corporation or town to which lands may have been granted for
the establishment of a town by the Spanish or Mexican government, or the
lawful authorities thereof, nor to any city, or town, or village lot, which
city, town or village existed on the seventh day of July, eighteen hundred
and forty-six; but the claim for the same shall be presented by the corpo-
rate authorities of the said town, or where the land on which the said city,
town or village was originally granted to an individual, the claim shall be
presented by or in the name of such individual, and the fact of the existence
of the said city, town or village on the said seventh July, eighteen hundred
and forty-six, being duly proved, shall be *prima facie* evidence of a grant to
such corporation, or to the individual under whom the said lotholders claim;
and where any city, town or village shall be in existence at the time of pass-
ing this act, the claim for the land embraced within the limits of the same
may be made by the corporate authority of the said city, town or village.

The city of San Francisco was incorporated in 1850, with municipal boundaries of less extent than four square leagues. It, however, presented to the board a claim for confirmation of title to a four square league tract. In December, 1854, the claim of the city was confirmed by the board to only a certain portion of the four square leagues claimed. The opinion of the majority of the commissioners is contained in the appendix to Dwinelle's History, pp. 121–147. The opinion makes clear the fact that the decree of confirmation was based upon the following conclusions, to wit: .

"1st. That a pueblo or town was established under the authority of the Mexican government in California, on the site of the present city of San Francisco, and embracing the greater portion of the present corporate limits of said city. .

"2d. That the town so established continued and was in existence as a municipal corporation on the 7th day of July, 1846.

"3d. That at or about the time of its establishment, certain lands were assigned and laid off in accordance with the laws, usages and customs of the Mexican nation, for the use of the town and its inhabitants, and the boundaries of said lands determined and fixed by the proper officers appointed for that purpose by the territorial government.

"4th. That the boundaries so established are those described in the communication from Governor Figueroa to M. G. Vallejo, dated November 4, 1834, a copy of which is filed in the case, marked Ex. No. 18, to the deposition of said Vallejo." (Dwinelle, App. 147.)

After the foregoing finding of facts, the board summed up the law in the following language :

"These conclusions bring the case, in our opinion, clearly within the operation of the presumption raised in favor of a grant to the town by the fourteenth section of the act of the 3d of March, 1851, and entitle the petitioner to a confirmation of the land contained within the boundaries described in the document above mentioned."

Whilst the ultimate finding of the board was thus rested upon the authority to presume a grant conferred by Congress

and upon the Mexican law and regulations and conduct of Spanish and Mexican officials, which were limited to particular localities, and which have no application to the Spanish law as it appears in the Recopilacion, its opinion yet contained a copious historical review of the Spanish and Mexican law on the subject of grants to towns. From the fact that both the early Spanish law and the Mexican law were considered, and growing out of some forms of expression contained in the opinion, it has sometimes been said, with inaccuracy, that the opinion sanctioned the proposition that every Spanish town, considering the Spanish law to which reference has been made, was entitled to a grant of four square leagues.

The want of foundation for this often reiterated misconception of the finding of the board of commissioners will be at once shown by a brief consideration of the instructions and documents, apart from the text of the Recopilacion itself, upon which the board acted. They were five in number, as follows:

(1.) Instructions, etc., of Don Antonio Bucareli Urusu, dated Mexico, August 17, 1773. (Dwinelle, App. p. 2; 1 Rockwell, 444.)

(2.) Regulations of Don Felipe de Neve, approved by the King, October 24, 1781. (Dwinelle, App. p. 3; 1 Rockwell, 445.)

(3.) Instructions made for the establishment of the new town of Pitic, dated Chihuahua, November 14, 1789. (Dwinelle, App. p. 11.)

(4.) Decree of Don Pedro de Nerva, dated Chihuahua, March (October) 22, 1791. (Dwinelle, App. 17; 1 Rockwell, 451), and

(5.) Opinion of the assessor or legal adviser of that comandacia, dated in 1785.

Document No. 1 makes no reference to a designation or granting of lands for the use of pueblos.

No. 2.— to wit, Regulations of 1781 for the government of the Province of California — referred to the existence of the new establishments of the presidios and the respective ports of San Diego, Monterey and San Francisco, and the founding and building of the pueblo of San José, and prescribes certain

regulations for carrying into effect the expected establishment of proposed new settlements. These regulations rested undoubtedly on the laws of the Indies, but make material additions and modifications thereto. Section 4 provides that conformably to the provisions of the laws of the kingdom competent common lands shall be "designated" for the pueblos, but there is no statement as to the law governing the quantity of land to be marked out. The regulations, however, were specially approved by the King of Spain.

No. 3 — the Plan of Pitic — commences with the following statement :

"Instructions approved by His Majesty, and made for the establishing of the new town of Pitic, in the Province of Sonora, ordered to be adopted by the other new projected settlements (Poblaciones) and by those that may be established in the district of this General 'Comandancia.'"

The second section of the instruction reads as follows :

"2d. In conformity with the decree of the law 6th, title 5th, of the same book 4th, relative to the towns of Spaniards that may be founded by agreement or contract, and first in relation to those which for want of contractors shall be erected by private settlers (Pobladores) who may establish themselves and agree to found them, there may be granted to the town in question four leagues of bounds or territory in a square or in length, (que se fundaren y concordaren enformarlas se podrá conceder á la de que se exara quatro leguas determino ó territorio en quadro ó prolongado,) as shall be adapted to the better location of the land that shall be selected or marked out so that its true boundaries shall be known, wherein there can be no inconvenience, and, inasmuch as it is distant more than five leagues from any other town, city or village of Spaniards, there shall not result injury to any private individual, nor to any 'pueblo' of Indians, on account of that (the village) 'de los Seris' remaining within the demarcation as part or suburb of the new settlement, subject to its jurisdiction, and with the advantage of enjoying as neighbors the same benefits public and common that the settlers may have, and of which at present those same natives are wanting, owing to their indo-

lence, their default of application, and of intelligence, reserving to them the faculty of choosing their 'Alcaldes and Regidores,' with the jurisdiction, economy and other circumstances prescribed by the laws 15 and 16, title 5, book 6."

It is obvious from the most casual examination of this section that it not only does not support the theory that under the Recopilacion the right to four square leagues was granted to each and every settlement, but, on the contrary, that its plain purpose was simply to grant the discretionary power to allot four square leagues to settlements not under contract and to exempt such grants from many requirements of the Recopilacion, such as that as to the number of residents and the conditions to be performed on the part of the founder of the settlement. In other words, this decree, which was approved by the King of Spain, was substantially an act of new and supplementary legislation, adding to the provisions of the Recopilacion, and conferring rights not covered by its text. The fact of the making of this decree conveying the authority to give four square leagues in cases where there was no contract, demonstrates of course that the power thus given was not deemed theretofore to have existed by the specific terms of laws specially applicable to town settlements. For how can it be supposed that a solemn order would have been required from the King to sanction the doing of that which the law already expressly permitted. It is to be observed, also, that the delegation of power to make a grant of four square leagues in cases of non-contract does not import the significance that by operation of law such a grant was made in every case. The language is, there "may be" granted to the town in question, not that there "shall be" granted in every case, or that the governor "shall be" obliged to do so.

No. 4 — the Decree of Pedro de Nerva, under date of October 22, 1791 — refers to an opinion of an official styled the assessor of the comandancia general. The portion of the decree having pertinency here reads as follows:

"And considering the extent of four common leagues measured from the centre of the presidio square, viz., two leagues

in every direction, to be sufficient for the new pueblos to be formed under the protection of said presidios, (que van formandose á su abrigo) I have likewise determined, in order to avoid doubts and disputes in the future, that said captains restrict themselves henceforward to the quantity of house-lots and lands within the four leagues already mentioned, without exceeding in any manner said limits, leaving free and open the exclusive jurisdiction belonging to the intendentes of the royal hacienda, respecting the sale, composition and distribution of the remainder of the land in the respective districts."

The language of this decree, instead of confirming the theory that every town was entitled to four square leagues under the law of Spain, on the contrary, would seem to indicate that De Nerva considered that the extent of the boundaries of the new pueblos should be subject to his uncontrolled discretion. Indeed, in *Welch* v. *Sullivan*, 8 California, 165, this decree was interpreted as largely extending the limits of pueblos beyond four square leagues.

No. 5. — the opinion of one Galindo Nevara — is printed on pages 10 and 11 of the appendix to Dwinelle's work, and is treated as the opinion cited in De Nerva's decree of October 22, 1791. It was addressed to the honorable commandant general, and is dated October 27, 1785. It considers the question of the right to make requested allotments of lands for cattle ranches, and in the course of the document the writer observes that such allotments should not be made within the boundaries assigned to pueblos, which, in conformity to law 6, title 5, lib. c. 4, of the Recopilacion, must be four leagues of land in a square or oblong body according to the nature of the ground. This cannot be the opinion to which De Nerva referred in 1791, for the one to which he alludes related to the authority which was possessed over the distribution of lands of a presidio. Nor can this mere opinion, if authentic, be considered as conclusive, or even as persuasively determining the meaning of law 6, since it cannot be reconciled with the subsequent decree of 1791, declaring that, "in order to avoid doubts and disputes in future," it was necessary to specify the precise quantity of land to constitute the limits of the

pueblos to be subsequently established. The inference to be deduced from all these documents supports the theory that under the Spanish laws, as found in the Recopilacion, all towns were not entitled by operation of law to four square leagues, but that at a late date the Spanish officials had adopted the theory that four square leagues was the normal quantity which might be designated as the limits of new pueblos to be thereafter created.

Whether from these amendments or supplements to the Spanish law it was correctly held that a fixed quantity of land passed to every new pueblo by effect of law, is not relevant to the matter now under consideration, as the rights of Santa Fé, if any, arose long prior to the period to which these documents relate, and depend upon the Spanish law and that law exclusively. It would seem, however, from the statement of Hall, already quoted, *supra*, that the implication that every new Mexican town was entitled to four square leagues was a misconception. This review has been made in order, at the outset, to remove the erroneous conception which has been so often reiterated, as to the right of towns, by mere operation of law, under the Spanish law, to four square leagues. It is really unnecessary, however, to analyze the opinion of the board of land commissioners for the purpose of showing that no recognition of a right, by operation of law, to four square leagues was contained in it, for the reason that it is obvious that the decision of the board confirming only a portion of the claim of the city of San Francisco was a rejection of the four square league theory. That San Francisco so interpreted the decree is manifested by the fact that it was not accepted by that city as final; but an appeal was taken to the District Court, to which court also the United States appealed. Moreover, the action of Congress in confirming, in 1864, under certain conditions, a limited right in favor of San Francisco, and its final action, in 1866, in confirming the right of that city to four square leagues, with many important reservations, and upon conditions wholly incompatible with the existence, in that city, of a primordial right to four square leagues, amounted to a refusal by Congress to recognize the theory that every

town was entitled to four square leagues. On the contrary, those acts were tantamount to an assertion by Congress of its undoubted right to control the disposition of the land so far as it deemed best to do so. Acts July 1, 1864, c. 194, sec. 5, 13 Stat. 332, 333, and March 8, 1866, c. 13, 14 Stat. 4.

In passing, we also observe that the same reasons which cause it to be unnecessary to examine, in detail, the opinion of the board of land commissioners, also renders it unessential to analyze and determine the persuasive effect of the cases subsequently decided by the Supreme Court of California, cited in argument by the city, viz., *Welch* v. *Sullivan*, 8 California, 165, 168; *Hart* v. *Burnett*, 15 California, 530. The issue which those cases presented was the nature of the title of San Francisco, on the conceded premise that it possessed a title of some kind. This question was solved by a full reference to the Spanish and Mexican law; much in the same manner as the board of land commissioners had previously done.

An appeal was taken from the decision of the board of land commissioners to the District Court of the United States. We quote, as to subsequent steps in the controversy, from the opinion in *San Francisco* v. *LeRoy*, 138 U. S. 656, 666:

"In April, 1851, the charter of San Francisco was repealed and a new charter adopted. Pending the appeal of the pueblo claim in the United States District Court, the Van Ness ordinance, above mentioned, was passed by the common council of the city, by which the city relinquished and granted all its right and claim to land within its corporate limits as defined by its charter of 1851, with certain exceptions, to parties in the actual possession thereof by themselves or tenants on or before the first of January, 1855; provided such possession was continued up to the time of the introduction of the ordinance into the common council, which was in June, 1855, or, if interrupted by an intruder or trespasser, had been or might be recovered by legal process; and it declared that for the purposes contemplated by the ordinance persons should be deemed possessors who held titles to land within those limits by virtue of a grant made by any ayuntamiento, town council, alcalde or justice of the peace of the former pueblo

before the 7th of July, 1846, or by virtue of a grant subsequently made by the authorities, within certain limits of the city previous to its incorporation by the State, provided the grant, or a material portion of it, had been recorded in a proper book of records in the control of the recorder of the county previous to April 3, 1851. The city, among other things, reserved from the grant all the lots which it then occupied or had set apart for public squares, streets and sites for school houses, city hall and other buildings belonging to the corporation, but what lots or parcels were thus occupied or set apart does not appear.

"Subsequently, in March, 1858, the legislature of the State ratified and confirmed this ordinance (Stat. of Cal. of 1858, c. 66, p. 52), and by the fifth section of the act of Congress to expedite the settlement of titles to lands in the State of California, the right and title of the United States to the lands claimed within the corporate limits of the charter of 1851 were relinquished and granted to the city and its successors for the uses and purposes specified in that ordinance. 13 Stat. 333, c. 194, § 5."

But that the relinquishment thus referred to was not considered by Congress as equivalent to a recognition of an absolute title in the city of San Francisco, but was deemed to be an act of grace and grant on the part of Congress, is shown by the fact that the fifth section contained, in addition to the relinquishment referred to in the foregoing quotation, the following provision: "There being excepted from this relinquishment and grant all sites or other parcels of lands which have been, or now are, occupied by the United States for military, naval or other public uses, or such other sites or parcels as may hereafter be designated by the President of the United States, within one year after the rendition to the General Land Office by the surveyor general, of an approved plat of the exterior limits of San Francisco, as recognized in this section, in connection with the lines of the public surveys." It was also further provided: "That the relinquishment and grant by this act shall in no manner interfere with or prejudice any *bona fide* claims of others whether asserted

adversely under rights derived from Spain, Mexico or the laws of the United States, nor preclude a judicial examination and adjustment thereof."

This act of Congress transferred the appeal which had been taken to the District Court from the decision of the board of land commissioners from that court to the Circuit Court of the United States. The latter court, in its opinion rendered on the hearing of the appeal, *San Francisco v. United States,* 4 Sawyer, 553, 561, 573, accepted as admitted "the existence of an organized pueblo at the present site of the city of San Francisco upon the acquisition of the country by the United States on the 7th of July, 1846; the possession by that pueblo of proprietary rights in certain lands and the succession to such proprietary rights by the city of San Francisco." It was also assumed to be conceded (pp. 561–574): "That the lands appertaining to the pueblo were subject, until by grant from the proper authorities they were vested in private proprietorship, to appropriation to public uses by the former government and, since the acquisition of this country, by the United States." The Circuit Court, contrary to the holding of the board, found that the limits of the pueblo had never been measured or marked off, and considered the question as to the extent of lands in which a pueblo acquired an interest under Mexican laws, and determined it to be four square leagues. But although the opinion referred to the Spanish law, the conclusion as to the right of San Francisco was based upon Mexican laws, customs and usages, and the reasoning of the opinion was in accord with that of the board of land commissioners, to which we have already referred. The claim of the city was confirmed "in trust, for the benefit of the lotholders under grants from the pueblo, town or city of San Francisco, or other competent authority, and as to any residue in trust for the use and benefit of the inhabitants of the city." There was excepted, however, from the confirmation such parcels of land within the four square leagues, "as have been heretofore reserved or dedicated to public uses by the United States; and also such parcels of land as have been by grants from lawful authority vested in private pro-

prietorship, and have been finally confirmed to parties claiming under said grants, by the tribunals of the United States, or shall hereafter be finally confirmed to parties claiming thereunder by said tribunals, in proceedings now pending therein for that purpose." *San Francisco* v. *United States*, *supra*, 577.

That this decision was in conflict with the claim of the city that under the Mexican law it was entitled, as a matter of right, to four square leagues, is shown by the finding of the court that whatever was the right in the city it was so inchoate that up to the time of confirmation by the United States all the ungranted land within the area claimed was subject to such dedication for public purposes as the United States saw fit to make. That is, that the whole ungranted land covered by the claim was substantially public domain at the entire disposition of the United States for public purposes. That this decision was not in accord with the asserted claims of the city of San Francisco, is also again shown by the fact that appeals were taken therefrom to this court by both the city and the United States. Pending these appeals, Congress passed an act to quiet titles to the land within the city limits, which was approved March 8, 1866, c. 13, 14 Stat. 4. At that time the limits of the city were coterminous with those of the county, and embraced the whole of the four leagues to which the city asserted rights. The act of 1864, it must be remembered, merely released the right and title of the United States to the lands within the then corporate limits of the city of San Francisco, as defined in the charter of April 15, 1851, which was much less than the four square leagues.

By the act of 1866 the United States relinquished and granted to the city all the land embraced in the decree of the Circuit Court subject to the reservations and exceptions designated in that decree, and upon the following further conditions and trusts, viz.:

"That all the said land, not heretofore granted to said city, shall be disposed of and conveyed by said city to parties in the *bona fide* actual possession thereof, by themselves or tenants, on the passage of this act, in such quantities and upon

such terms and conditions as the legislature of the State of California may prescribe, except such parcels thereof as may be reserved and set aside by ordinance of said city for public uses."

The act moreover provided that such relinquishment and grant should not interfere with or prejudice any valid adverse right or claim, if such exist, to said land or any part thereof, whether derived from Spain, Mexico or the United States, or preclude a judicial examination thereof.

It will thus be seen that the act of 1866 again asserted the power of Congress over the entire subject by materially modifying the decree of the Circuit Court of the United States, inasmuch as it placed restrictions on the power of disposition of the lands, and practically imposed a trust, not only upon the city of San Francisco, but upon the legislature of the State of California. In consequence of the passage of this act, the appeals of both the city and the United States which were pending in this court were withdrawn. *Townsend* v. *Greeley*, 5 Wall. 326; *San Francisco* v. *LeRoy*, 138 U. S. 656, 667.

Subsequent to the passage of the act of Congress, an act was passed by the legislature of California known as the "San Francisco Outside Land Bill," but it was vetoed by the governor of California, because in his opinion it was in conflict with the act of Congress of March 8, 1866. (Dwinelle, App. p. 352.)

We are now brought to consider the last proposition advanced by the city, which is —

Third. *That the interpretation of the Spanish law upon which the city bases its right, is sanctioned by previous adjudications of this court.*

The decisions relied upon are *Townsend* v. *Greeley*, 5 Wall. 326; *Grisar* v. *McDowell*, 6 Wall. 363; *Brownsville* v. *Cavazos* 100 U. S. 138; and *San Francisco* v. *LeRoy*, 138 U. S. 656.

An examination, however, of these cases will show that they cannot be held to sustain the proposition.

*Townsend* v. *Greeley* came to this court on error to a judgment of the Supreme Court of California, affirming a judgment in favor of Greeley, who had acquired a title to land

within the limits confirmed to San Francisco by the board of land commissioners, under an ordinance of the city. The defendant claimed title under a sale on execution upon a judgment recovered against the city. The rights of both parties, therefore, depended upon the existence of a title in the city, and the only question at issue between them was which had derived the paramount right from the city, the defendant disputing the possession which plaintiff claimed had been in his grantors. Under this state of the record it was, of course, absolutely impossible for the question to arise whether or not there was title in the city to the land in dispute, or the extent of land which the title of the city, whatever it was, covered. The sole question presented in this court was whether the lower court had committed error in rejecting certain proffered evidence, and the determination of this question involved the ascertainment of whether the title which was in the city was of such a character as could be seized and sold under execution. In deciding this question the opinion, whilst referring to the facts out of which the controversy arose, contains the statement (p. 336) that "the laws and ordinances of Spain for the settlement and government of her colonies on this continent provided for the assignment to pueblos or towns, when once established and officially recognized, for their use and the use of their inhabitants, of four square leagues of land." But this language was not material to the question before the court, and was not, therefore, a decision settling the matter.

The decision in *Grisar* v. *McDowell, supra,* was, in fact, a denial of any right in San Francisco by operation of law, Spanish or Mexican, to four square leagues of land. The case involved a controversy between one holding a title under San Francisco and an officer of the United States in possession of a military reservation within the four square leagues. The court simply decided that, conceding some right or interest or claim in the city to land, it was subject to appropriation by the government for public uses. In a general reference to the claims of the city, there are dicta to the effect that by the laws of Spain a pueblo acquired some right in four square leagues

of land, but the decision did not necessarily determine that question, as it was not before the court.

In *Brownsville* v. *Cavazos, supra,* the question at issue was the title to land of Brownsville derived under Mexican laws. The action was ejectment by the city of Brownsville as the successor in the United States of the Mexican town of Matamoras, claiming title to a tract of land, to obtain title to which the city of Matamoras had instituted proceedings in expropriation or condemnation. The decision was that the city of Matamoras had never acquired title to the land because compensation had not been made, and that Brownsville consequently possessed no title. It is obvious that in the determination of that question the rights of pueblos, under Spanish laws, were not involved. It follows, therefore, that the reiteration, in the course of the opinion in that case, of the dicta found in the previous cases on the subject of the rights of pueblos under Spanish law cannot be treated as authoritative on that question.

In *San Francisco* v. *LeRoy, supra,* the object of the bill filed was to quiet the title of complainant as against the city of San Francisco to certain lands within the city limits. There was no controversy as to the extent of land in which a Spanish pueblo acquired some right by its establishment, nor was the question considered by the court. In reciting the history of the litigation over the San Francisco claim to four square leagues, the learned justice who delivered the opinion of the court did not directly refer to the rights acquired under Spanish laws, but contented himself with an allusion to the rights which a Mexican pueblo acquired in lands by operation of Mexican laws.

In passing from this brief review of the decisions of this court relied on by the city of Santa Fé, we note the reference to the case of *Lewis* v. *San Antonio,* 7 Texas, 288. In that case the court found that there had been an express grant of six square leagues to the predecessor of the town of San Antonio, and refuted the attempt to destroy the express grant on the ground that as, by operation of law, towns were entitled to four leagues, the express grant of six was void, by saying that

no law had been referred to supporting such an assertion. The implication from this adjudication refutes rather than supports the claim here contended for.

But, in concluding the consideration of the foregoing contentions-advanced by the city of Santa Fé, and which are shown by the review which we have made to be without merit, we will now demonstrate that the right to recover the land here claimed, is without foundation on other and distinct grounds.

It cannot be doubted that under the law·of Spain it was necessary that the proper authorities should particularly designate the land to be acquired by towns or pueblos, before a vested right, or title to the use thereof could arise. Thus, by law 7, book 4, title 7, of the Recopilacion which regulated the mode of distribution of a tract granted by agreement to a founder of a settlement, it was provided as follows (2 White, New Recop. p. 46):

"The tract of territory granted by agreement to the founder of a settlement shall be distributed in the following manner: They shall, in the first place, lay out what shall be necessary for the site of the town and sufficient liberties, [exidos,] and abundant pasture for the cattle to be owned by the inhabitants, and as much besides for that which shall belong to the town [propios]. The balance of the tract shall then be divided into four parts; one to be selected by the person obligated to form the settlement, and the remaining three parts to be divided in equal portions among the settlers."

Law 11 of the same book and title, provides also (2 White, New Recop. p. 46):

"The lots shall be distributed among the settlers by lot, beginning with those adjoining the main square, and the remainder shall be reserved to us, to give, as rewards, to new settlers, or otherwise, *according to our will;* and we command that a plan of the settlement be always made out."

And law 12 of the same book and title declares (2 White, New Recop. p. 47):

"We command that no houses be erected within the distance of three hundred paces from the walls or breastworks of

the town, this being necessary for the good of our service and for the safety and defence of the towns, as provided with regard to castles and fortresses."

And it is well to notice at this point that Santa Fé was a fortified town; it possessed a castle, and not only the land upon which it was erected but a considerable extent of land surrounding it was in any view a part of the public domain, and passed as such to the United States. *Mitchel* v. *United States*, 15 Pet. 52, 89, 91.

The Spanish understanding of the prerequisite designation is well illustrated by the following passages from Elizondo's Practica Universal Forense.

At vol. 3, p. 109, he says :

"The Kings, the fountains of jurisdictions, are the owners of all the *terminos* situated in their kingdoms, and as such can donate them, divide or restrict them, or give any new form to the enjoyment thereof, and hence it is that the pueblos cannot alienate their terminos and pastos without precedent royal license and authority."

And at vol. 5, p. 226, he says :

"There is nothing whatever designated by law as belonging to towns, other than that which by royal privilege, custom or contract between man and man, is granted to them, so that although there be assigned to the towns at the time of their constitution a *territorio* and *pertinencias*, which may be common to all the residents, without each one having the right to use them separately, it is a prerogative reserved to the princes to divide the *terminos* of the provinces and towns, assigning to these the use and enjoyment, but the domain remaining in the sovereigns themselves."

Considering this subject, this court, speaking through Mr. Justice Field in *Grisar* v. *McDowell*, 6 Wall. 363, 373, said :

"These laws provided for the assignment to the pueblos, for their use and the use of their inhabitants, of land not exceeding in extent four square leagues. Such assignment was to be made by the public authorities of the government upon the original establishment of the pueblo, or afterwards upon the petition of its officers or inhabitants ; and the land was to

be measured off in a square or prolonged form, according to the nature and condition of the country. All lands within the general limits stated, which had previously become private property or were required for public purposes, were reserved and excepted from the assignment.

"Until the lands were thus definitely assigned and measured off, the right or claim of the pueblo was an imperfect one. It was a right which the government might refuse to recognize at all, or might recognize in a qualified form; it might be burdened with conditions and it might be restricted to less limits than the four square leagues, which was the usual quantity assigned."

Moreover, the general theory of the Spanish law on the subject indicates that, even after a formal designation, the control of the outlying lands, to which a town might have been considered entitled, was in the King, as the source and fountain of title, and could be disposed of at will by him or by his duly authorized representative, as long as such lands were not affected by individual and private rights. This is shown by the quotation from Elizondo, already made. The provisions of law 14, title 12, book 4, of the Recopilacion (2 White, New Recop. p. 52), which is reproduced in the margin, illustrates the absolute control thus exercised by the King of Spain over the subject.[1]

---

[1] *Law 14, title 12, book 4 of Recopilacion.*

"Whereas we have fully inherited the dominion of the Indies; and, whereas the waste lands and soil which were not granted by the kings, nor predecessors, or by ourselves, in our name, belong to our patrimony and royal crown, it is expedient that all the land which is held without just and true titles be restored, as belonging to us, *in order that we may retain, before all things all the lands which may appear to us and to our viceroys, audiences and governors, to be necessary for public squares, liberties, [exidos,] reservations, [propios] pastures and commons, to be granted to the villages and councils already settled, with due regard as well to their present condition as to their future state, and to the increase they may receive,* and after distributing among the Indians whatever they may justly want to cultivate, sow and raise cattle, confirming to them what they now hold, and granting what they may want besides — all the remaining land may be reserved to us, clear of any incumbrance, for the purpose of being given as rewards, or disposed of according to our pleasure: For all this, we order and command the vice-

The existence of this power of control and disposition as to municipal lands in the supreme Spanish authority finds a further and cogent exemplification in the decree of the Cortes of January 4, 1813, referred to by Hall in his Mexican Law, p. 45. A like power, it is to be inferred, is now asserted to be lodged in and has actually been exercised by the general government of Mexico. The constitution of Mexico of February 5, 1857, which went into effect September 16 of the same year, prohibited the acquisition or administration of real property by civil or ecclesiastical corporations without any other exception than the buildings intended immediately or directly for the service or purpose of the institutions, and hence arose the necessity for the abolition of municipal commons (exidos) in order to comply with this constitutional provision. In discussing the subject, Orozco, a Mexican writer, in his "Legislation and Jurisprudence on Public Lands" (vol. 2, p. 1107), after pointing out the distinction between pueblo sites (tundo) and the ejidos or commons of a pueblo, says:

"The municipal commons, (ejidos,) as has been seen, were excluded by the laws abolishing mortmain; but, in view of the aforesaid constitut. nal precept, it was logical to infer that the municipal commons (ejidos) passed to the control of the Federal treasury, as successor by subrogation of the property of corporations, and with so much the more reason since, recalling the origin of the municipal commons (ejidos) as soon as their existence became impossible, nothing is more natural and consequential than that those lands should revert to the dominion of him who granted them for the common use of the residents of the settlements."

After reciting the fact that in order to "reconcile respect for the supreme law with the interest of these pueblos," the

---

roys, presidents and pretorial audiences, whenever they shall think fit, to appoint a sufficient time for the owners of lands to exhibit before them and the ministers of their audiences, whom they shall appoint for that purpose, the titles to lands, estates, huts and caballerias, who, after confirming the possession of such as hold the same by virtue of good and legal titles, or by a just prescription, shall restore to us the remainder, to be disposed of according to our pleasure."

general law, after fixing the limits of the pueblos and dedicating to public uses the cemeteries and other public places therein, directed that the remainder of the land should be distributed among the fathers or heads of families, the author adds:

" In this way it has been carried into effect, titles signed by the president of the republic in favor of those residents of the pueblos being issued gratis by the department of public works, all of which proves that the Federal government and not the common councils, nor any other authority is that which, as competent in the matter, graciously grants the disposable part of the ancient municipal commons (ejidos)."

It was doubtless a consideration of this state of the Spanish law and the unquestioned power lodged in the King of Spain to exercise unlimited authority over the lands assigned to a town and undisposed of and not the subject of private grant (to all of which rights the United States succeeded as successor of the King of Spain and the government of Mexico), which caused Congress, in enacting the laws of 1864 and 1866, to carve out of the claim of San Francisco such land for public purposes as it saw fit, to authorize further reservations to be made within a period of one year, and to subject the lands relinquished to specific trusts imposed not alone upon the municipality of San Francisco, but also upon the general assembly of California. The power thus asserted by the act was not new, but conformed to and accorded with the practice of the government from the beginning. Thus, in 1812, Congress, by an act approved June 13 of that year, c. 99, 2 Stat. 748, for the settlement of claims to land in the Territory of Missouri (where rights under the laws of Spain existed), provided, by section 1, for the survey of the boundaries of towns and for the confirmation to individuals of such lots therein covered by actual possession, and for the confirmation of such commons to the towns as had been actually possessed and used by the town. So far as all the other commons, not so actually possessed, were concerned, and the lots within the town not possessed and claimed by individuals, the absolute right to dispose of the same was asserted by Congress, and a

portion thereof was dedicated by that body to public uses. The first section is reproduced in the margin;[1] and the second section, accomplishing the results just indicated, reads as follows: -

"SEC. 2. And be it further enacted, That all town or village lots, out lots or common field lots, included in such surveys, which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, shall be, and the same are hereby reserved for the support of schools in the respective towns and villages aforesaid: Provided, that the whole quantity of land contained in the lots reserved for the support of schools in any one town or village, shall not exceed one-twentieth part of the whole lands included in the general survey of such town or village."

---

[1] *Section 1 of Act of June* 13, 1812 (2 *Stat.* 748).

"That the rights, titles and claims, to town or village lots, out lots, common field lots and commons, in, adjoining and belonging to the several towns or villages of Portage des Sioux, St. Charles, St. Louis, St. Ferdinand, Village a Robert, Carondelet, St. Genevieve, New Madrid, New Bourbon, Little Prairie and Arkansas, in the Territory of Missouri, which lots have been inhabited, cultivated or possessed, prior to the twentieth day of December, one thousand eight hundred and three, shall be and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto: *Provided*, that nothing herein contained shall be construed to affect the rights of any persons claiming the same lands, or any part thereof, whose claims have been confirmed by the board of commissioners for adjusting and settling claims to land in the said territory. And it shall be the duty of the principal deputy surveyor for the said territory as soon as may be, to survey, or cause to be surveyed and marked (where the same has not already been done, according to law) the out boundary lines of the said several towns or villages so as to include the out lots, common field lots and commons, thereto respectively belonging. And he shall make out plats of the surveys, which he shall transmit to the surveyor general, who shall forward copies of the said plats to the Commissioner of the General Land Office, and to the recorder of land titles; the expenses of surveying the said out boundary lines shall be paid by the United States out of the moneys appropriated for surveying the public lands: Provided that the whole expense shall not exceed three dollars for every mile that shall be actually surveyed and marked."

The same course was adopted by Congress in the act of February 8, 1827, c. 9, 4 Stat. 202, providing for the settlement and confirmation of claims to lands in the former Spanish domain of East Florida. The third section of that act, confirming to the city of St. Augustine certain lands, is as follows:

"SEC. 3. *And be it further enacted,* That the commons in the city of St. Augustine be, and the same are hereby, confirmed to the corporation of said city, to the same extent that they were used, claimed and enjoyed under the Spanish government. And the parochial church and burying ground in possession of the Roman Catholic congregation are confirmed to them, and the old Episcopal Church lot is, hereby, relinquished and confirmed to the Incorporated Episcopal Church of St. Augustine: Provided always, That the grants in this section specified shall forever inure to the purposes for which they are confirmed, and shall not be alienated without the consent of Congress."

So, also, it may well be supposed that it was upon this aspect of the imperfect nature of right in land claimed by towns in territory formerly owned by Spain and Mexico, and the long established construction of such rights evidenced by the foregoing acts of Congress, which caused this court, speaking through Mr. Justice Field, in *Grisar* v. *McDowell, supra,* to say, p. 373:

"Even after the assignment the interest acquired by the pueblo was far from being an indefeasible estate such as is known to our laws. The purposes to be accomplished by the creation of pueblos did not require their possession of the fee. The interest . . . amounted to little more than a restricted and qualified right to alienate portions of the land to its inhabitants for building or cultivation, and to use the remainder for commons, for pasture lands or as a source of revenue, or for other public purposes. And this limited right of disposition and use was in all particulars subject to the control of the government of the country."

How completely this language applies to the case here presented is demonstrated when it is considered that there is no

proof of a single act of ownership by the city, either in its own right or by anybody else, claiming to hold under it, and that it is asserted in the brief of the counsel for the government and not denied that practically every foot of the area of four square leagues now claimed by the city is covered by grants made by the governors of the province of New Mexico to others. Whether these grants be valid or not of course is not before us for consideration.

An inchoate claim, which could not have been asserted as an absolute right against the government of either Spain or Mexico, and which was subject to the uncontrolled discretion of Congress, is clearly not within the purview of the act of March 3, 1891, c. 539, creating the Court of Private Land Claims, 26 Stat. 854, and, therefore, is beyond the reach of judicial cognizance.

The duty of protecting imperfect rights of property under treaties such as those by which territory was ceded by Mexico to the United States in 1848 and 1853, in existence at the time of such cessions, rests upon the political and not the judicial department of the government. *Les Bois* v. *Bramell*, 4 How. 449, 461; *Ainsa* v. *United States*, 161 U. S. 208, 222. To the extent only that Congress has vested them with authority to determine and protect such rights, can courts exercise jurisdiction. Where, therefore, a tribunal of limited jurisdiction is created by Congress to determine such rights of property, a party seeking relief must present for adjudication a case clearly within the act, or relief cannot be given. *United States* v. *Clarke*, 8 Pet. 436, 444.

Section 13 of the act provides that all the proceedings and rights theretofore referred to in the act shall be conducted and decided subject to certain provisions therein enumerated and to the other provisions of the act. Among the provisions contained in section 13 is the following:

"First. No claim shall be allowed that shall not appear to be upon a title lawfully and regularly derived from the government of Spain or Mexico, or from any of the states of the republic of Mexico having lawful authority to make grants of land, and one that if not then complete and perfect at the date

of the acquisition of the territory by the United States, the claimant would have had a lawful right to make perfect had the territory not been acquired by the United States, and that the United States are bound, upon the principles of public law or by the provisions of the treaty of cession, to respect and permit to become complete and perfect if the same was not at said date already complete and perfect."

By section 7 of the act the court was also required, in reaching a conclusion as to the validity of the claim, to be guided by the laws of nations, the stipulations of the treaties concluded between the United States and the Republic of Mexico of February 2, 1848, and December 30, 1853.

Although section 6 of the act also authorized the adjudication by the Court of Private Land Claims, of all claims which the United States " are bound to recognize and confirm by the treaties of cession of said country by Mexico to the United States, which at the date of the passage of this act have not been confirmed by act of Congress or otherwise finally decided upon by lawful authority, and which are not already complete and perfect," the meaning of the words "complete and perfect" is to be derived by considering the context and not by segregating them from the previous part of the sentence exacting that the claim must be one which the United States was bound to recognize and confirm by virtue of the treaty. These words are moreover controlled by the mandatory requirements of section 13.

Indeed, the controlling nature of the provisions of section 13 of the act of 1891 was considered and settled by this court in *Ainsa* v. *United States*, 161 U. S. 208, 223, where, speaking by Mr. Chief Justice Fuller, it was said :

"Under the act of March 3, 1891, it must appear, in order to the confirmation of a grant by the Court of Private Land Claims, not only that the title was lawfully and regularly derived, but that, if the grant were not complete and perfect, the claimant could *by right*, and not by grace, have demanded that it should be made perfect by the former government, had the territory not been acquired by the United States."

Although the act of 1891, in section 11, authorized a town.

presenting a claim for a grant to represent the claims of lot-holders to lots within the town, this provision does not over-ride the general requirements of the statute as to the nature of the claim to title which the court is authorized to confirm. The difference between the act of 1891 and the California act of 1851, hitherto referred to, accentuates the intention of Con-gress to confine the authority conferred by the later act to narrower limits than those fixed by the act of 1851. The act of 1851 authorized the adjudication of claims to land by virtue of any "right" or "title" derived from the Spanish government; and conferred the power in express language on the board and court to *presume a grant in favor of a town*. The act of 1891 not only entirely omits authority to invoke this presumption, but, as we have seen, excludes by express terms any claim, the completion of which depended upon the mere grace or favor of the government of Spain or Mexico, and of the United States as the successor to the rights of these governments.

Nor do certain expressions contained in the opinion in *San Francisco* v. *LeRoy*, 138 U. S. 656, and *Knight* v. *United States Land Association*, 142 U. S. 161, when properly under-stood, conflict with the foregoing conclusions. Those cases dealt with the rights of San Francisco after they were recog-nized by Congress, and to the extent only of that recognition. The language referred to, therefore, simply amounted to say-ing that as Congress had to a certain extent recognized the claim of San Francisco, to the limit of this recognition, and no further, the rights of that city would be treated as relating back and originating from the nature of the claim presented, and which in part through the grace of Congress had been allowed. In the case at bar we are not concerned with con-sidering or determining to what period of time or source of right the claim would relate if it were found to be within the reach of the provisions of the act of 1891.

The petition is framed upon the theory merely of a right to four square leagues, vested in the city by operation of law, and as the record contains no proof whatever as to the posses-sory claims of lotholders in the city of Santa Fé, or as to the

actual possession enjoyed by that city of public places, these latter rights, if any, as well as the asserted title of the city to the swamp tract to which reference has been made in the course of this opinion are not to be controlled by the rejection now made of the pretensions of the city to a title to the four square leagues tract asserted to have been acquired by operation of Spanish laws.

*The decree below is reversed, and the cause remanded with instructions to dismiss the petition.*

MR. JUSTICE BREWER concurs in the result.