YEAST v. PRU et al.

(District Court, D. New Mexico. August 6, 1923.)

No. 898.

1. Public lands ⊚➠211—Act confirming Spanish or Mexican grant is conclusive as to whether grant was to community or individuals.

An act of Congress passed December 22, 1858, confirming Spanish and Mexican grants of lands in New Mexico respectively to towns named, *held* conclusive that the grants were to the towns as communities, and not to the individuals on whose application the grants were made.

2. Public lands ⊚➠224½, New, vol. 11A Key-No. Series—Mexican grant held a town or community grant.

A Mexican grant of land to the residents of a district, which contemplated the settlement of a town, with commons for pasturage and other common purposes, and provided that all persons admitted to the settlement, who built houses and removed thereto might acquire title to their lots, and that any one who should not reside in the town should forfeit the right he had acquired to the property, *held* a town or community grant, and not a grant to the individual petitioners therefor.

⊚➠For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Public lands** ⟨⟩211—**Where a confirmatory act is necessary to establish title under a Mexican grant, the act is also conclusive as to the character of the grant.**

Where a confirmatory act of Congress is relied on to give validity to the title under a Mexican grant, the act must also be accepted as determining the character of the grant, whether vesting the title in a community or in individuals.

4. **Public lands** ⟨⟩211—**Estoppel to contest character of grant.**

Under Act July 22, 1854, imposing on the surveyor general of New Mexico the duty of ascertaining the "origin, nature, character and extent" of land grants in the territory, and reporting the same with his decision thereon to Congress, where after a hearing and without contest he reported in favor of confirmation of a grant to a town, and a confirmatory act was passed in 1858, individual claimants cannot for the first time after a lapse of 60 years, while relying on the confirmatory act to establish validity of the grant, which was not in fact within the jurisdiction of the granting authority, assert that it was not a community, but an individual, grant.

5. **Public lands** ⟨⟩223(4)—**On confirmation of Mexican grant to town, title to unallotted common lands vested in town.**

On confirmation by Congress of a Mexican grant of lands in New Mexico to a town, title to the common lands not allotted in severalty to settlers, vested in the town, free from any trust for the heirs or assigns of the original petitioners for the grant.

6. **Vendor and purchaser** ⟨⟩233—**New Mexico recording act applies to documents relating to Mexican grants.**

The New Mexico recording act of 1887, providing that the title of bona fide purchasers without notice shall not be affected by any written instrument not recorded by January 1, 1888, applies to documents relating to Mexican land grants.

7. **Municipal corporations** ⟨⟩147—**Acts of de facto trustees of town binding.**

Trustees of a town, in possession of the office under color of title, and with the acquiescence and approval of the public whether or not legally elected, are at least de facto officers, and their acts are binding on the town.

In Equity. Suit by Perry A. Yeast against Frank Pru, individually and as administrator of the estate of Jack Pru, deceased, and others. Decree for defendants.

Marron & Wood, of Albuquerque, N. M., for plaintiff.

John F. Simms and C. M. Botts, both of Albuquerque, N. M., and Harold Hurd, of Roswell, N. M., for defendant Pru.

H. B. Jamison, of Albuquerque, N. M., for cross-defendants Sais, Vallejos, Luna, Armijo, Garcia, Gargoura, Sanchez, Zamora, Pachecho, and Torres.

Reid, Hervey & Iden, of Roswell, N. M., for town of Casa Colorado.

R. P. Barnes, of Albuquerque, N. M., for trustees of Belen land grant.

PHILLIPS, District Judge. This is a bill in equity, brought by Perry A. Yeast against Frank Pru, individually and as administrator of Jack Pru, deceased, Casamiro Sais, and 11 other individual defendants, members of a class who are alleged claimants of interests in the Casa Colorado land grant, town of Casa Colorado, board of trustees of the town of Casa Colorado land grant, and board of trustees of the town of Belen land grant, to adjudge a breach of the covenants

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of seizin and good title contained in a deed by defendants Pru to plaintiff, to cancel certain notes and mortgages given to secure a portion of the purchase price of the lands conveyed by said deed, to recover back the portion of the purchase price paid in cash, and to restrain foreclosure proceedings on the mortgage.

The bill, after alleging jurisdictional facts, states:

That defendants Pru in October, 1920, conveyed to the plaintiff a tract of about 65,000 acres of land situated in the state of New Mexico, by a deed containing full covenants of clear title, seizin, and right to convey. That plaintiff paid them therefor in cash $101,349, and gave notes for the balance of the purchase price, aggregating $172,698, secured by a purchase-money mortgage on said land.

That when the first of these notes became due default was made in the payment thereof, and defendants Pru commenced an action against plaintiff in the district court of Valencia county to foreclose the mortgage. That plaintiff then ascertained that the defendants Pru never had title or seizin of said lands, but that title and seizin was then and now in other parties, that certain of them constituted a class so numerous as to make it impractical to bring them all before the court, and that none of them were or could be made parties to the foreclosure suit. That the defendants Pru were insolvent, and that plaintiff stood in peril of being required to pay the balance of the purchase price in the foreclosure suit, and later losing the land in ejectment to the other claimants. That plaintiff had answered in the foreclosure suit, setting up the above facts as a defense, and that the foreclosure suit was still pending undetermined. That subsequent to said answer in the foreclosure suit some of the class, claimants representing the class as a whole, had filed suit in ejectment for said lands against the plaintiff in the federal court for the district of New Mexico, and that the defendants Pru had assumed the defense thereof under their covenants, and that said ejectment suit was still pending.

All of the above-mentioned defendants appeared and answered. The individual claimants of the Casa Colorado land grant, representing a class, by their answer admitted the allegations of the bill and set up substantially the same facts as the complaint as a basis for claim of title in them, and prayed for a judgment establishing that title in the class. The town of Casa Colorado, the board of trustees of the town of Casa Colorado land grant, and the board of trustees of the town of Belen land grant, by their answers, denied the material allegations of the bill, with some minor exceptions which need not here be considered, and none of them asserted any title to the lands here in controversy. The defendants Pru by their answer denied all the allegations of plaintiff's bill purporting to show a breach of the covenants of seizin in the deed from the Prus to Yeast. They alleged a voluntary dismissal of the ejectment suit by the individual claimants of the Casa Colorado grant when it was ripe for trial on its merits; that the pretended claims of the individual claimants to the Casa Colorado land grant are not made in good faith; that the ejectment suit was not begun in good faith, but that said claims and suit were made and brought at the instigation of the plaintiff for the purpose of raising a pretended defense in the foreclosure suit; that said claimants were guilty of

laches; and that the plaintiff and defendants Pru were bona fide purchasers for value without actual or constructive notice of any revocation of any part of the original grant to Belen.

The following are the material facts in this cause:

In the early part of the year 1857 application was made by the town of Belen to the surveyor general of New Mexico for confirmation of the Belen grant. The hearing on the application was set for March 8, 1857. The surveyor general made the following report:

"Town of Belen—Decision.

"This case was set for trial on the 8th day of March, 1857.

"In the year 1740, Captain Diego de Torres, and Antonio de Salazar, for themselves and in the names of others, petitioned Gaspar Domingo de Mendoza, Governor and Captain General of New Mexico, for a grant of a tract of land in what is now the county of Valencia, with the boundaries therein contained, on the 9th day of November, 1740, said Governor and Captain General Gaspar Domingo de Mendoza granted the land in conformity with the request of the petitioners, and directed Nicolas Duran y Chaves, Senior Justice and War Captain of the Town of Albuquerque and its jurisdiction, to place the parties in possession of the land petitioned for, according to the provisions of the royal ordinances in such cases made and provided, which was accordingly done on the 9th day of December, 1740.

"The documents acted upon are copies of the originals in the archives of Santa Fé, duly certified.

"The testimony taken in the case shows the town to have been in existence when the United States obtained possession of the territory and the grant, and proceedings had thereon being in conformity with the usage and customs of the government of Spain in force at that time, the grant to the aforesaid town of Belen is approved and transmitted for the action of Congress in the premises. Wm. Pelham, Surveyor General.

"Surveyor General's Office,

"Santa Fé, New Mexico, March 8, 1857.

"Recorded in Vol. I of 'Land Claims Records' in surveyor general's office, pages 372 and 373."

The Belen grant was confirmed by the Act of Congress of 1858, 11 Statutes at Large, p. 374. The survey was made in 1860. On April 25, 1871, patent was issued by the United States to the town of Belen. The survey and patent included all of the lands in controversy in this suit.

On July 12, 1823, Jose Maria Perea, for himself, and in the name of the settlers of the Manzano, presented a petition to the corporation of Tome for a grant of land lying south of the southern boundary of the jurisdiction of Tome and extending south to the ruins of what is known as the old settlement of Las Nutrias, which tract of land, in part, was included in the above-mentioned grant to Belen; the tract of land in controversy in this suit lying within the exterior boundaries of both grants. This petition will be set out in full later in this opinion.

In the fall of 1856, the town of Casa Colorado presented a petition to the surveyor general for the confirmation of this grant. The matter was heard on the 5th day of December, 1856. The report of the surveyor general thereon is as follows:

"Town of Casa Colorado v. The United States.—Grant.

"The above case was set for trial on the 5th day of December, 1856.

"On the 12th day of July, 1823, Jose Maria Perea, for himself and in the

name of certain settlers of Manzano therein contained, petitioned the corporation of Tome, under whose jurisdiction the land was situated, for a grant of land for a settlement, with the boundaries set forth in said petition.

"On the 19th day of July, 1823, the corporation of the said town of Tome appointed a committee of its members to place the petitioners in possession of the land under the boundaries set forth in the petition, and transmitting the proceedings in the case for the approval of the provincial deputation, which approval was made by the provincial deputation of the territory of New Mexico on the 30th day of July, 1823.

"The papers acted upon by this office are the testimonios or certified copies of the original papers, given by direction of the provincial deputation, and certified to by the secretary thereof.

"The signature of the said secretary is duly proven by testimony, and, upon comparison with the records in this office bearing his signature, is believed to be genuine. It is also proven by testimony that the town was in existence at the time the United States took possession of the territory. The above grant is, in the opinion of this office, a good and valid one, and is therefore approved and transmitted to the proper department at Washington for the action of Congress in the premises.

"[Signed]   Wm. Pelham, Surveyor General.

"Surveyor General's Office,
"Santa Fé, New Mexico, December 24, 1856,"

The Casa Colorado grant was confirmed, by the same act of 1858 which confirmed the Belen grant, as a town grant to the town of Casa Colorado. The application for survey of the Casa Colorado grant was made after the application for and survey of the Belen grant. The survey was made in 1877. On the 26th day of July, 1909, a patent to the Casa Colorado grant was issued by the United States to the town of Casa Colorado.

The patent to the Belen grant, with the plat and survey, all of the documents presented to the surveyor general, and his report thereon (Plaintiff's Exhibit 1), were duly recorded in the real estate records of the counties in which the land in controversy in this suit is situated, prior to the date of any conveyance to plaintiff's predecessors in title from the town of Belen. The patent, plat, and survey only to the Casa Colorado grant were so recorded. The official plat of the survey of the Casa Colorado grant shows the overlap of the Belen grant and marks it on the plat "Belen."

The Las Nutrias papers, so called, hereinafter referred to, were never recorded in the real estate records of either county in which the land in controversy in this suit was situated. Yeast, the Prus, and Bivins had no actual notice of these papers, and had no notice of any facts which would put them on inquiry relative thereto.

All of the land in controversy in this suit passed by mesne conveyances from the board of trustees of the town of Belen to one Bivins, who in turn conveyed to Frank Pru and Jack Pru. Frank Pru and Jack Pru conveyed the land to the plaintiff in this case by the deed upon which plaintiff now seeks to predicate his claim for breach of covenant of seizin.

On the 6th day of January, 1912, a judgment and decree was duly entered in the district court of Valencia county in a civil cause then pending in said court, numbered 1766, wherein the board of trustees of the Belen land grant was plaintiff, and the board of trustees of the

town of Casa Colorado land grant and others were defendants. This decree adjudged that the title to the overlap of the two grants was in the town of Belen, and quieted the title thereto in the town of Belen. While the judgment recites that it is made by consent, the court affirmatively finds all the material facts necessary to the judgment and decree.

In the year 1911, the boards of trustees of Belen and Casa Colorado met for the purpose of settling the overlap between the two grants and agreed to a settlement thereof. The judgment above referred to was to effectuate this settlement. These boards of trustees, and all subsequent boards of trustees of Belen and Casa Colorado, respectively, at the several times they purported to act as such, were in possession of the office of trustee for their respective towns and engaged in the performance of the duties attached thereto. They were elected at elections purported to be held under the provisions of the act of 1907, being sections 799 to 817, both inclusive, of the New Mexico Statutes Annotated, codification of 1915, and therefore were acting under color of title to the office. In addition to this, both the people of Casa Colorado and Belen fully acquiesced in the acts of said persons as such trustees. No other board or purported board at any of these times was assuming or pretending to act as a board of trustees for said towns. Therefore these trustees, if not de jure, were unquestionably de facto, trustees of the respective towns they assumed to represent and act for as such trustees.

At the trial the following stipulation was entered into:

"It is hereby agreed and stipulated, for the purpose of this case only, between counsel for the plaintiff, Yeast, and counsel for Pru, and counsel for the cross-complaining defendants as a class, represented by Mr. Jamison, that the court may take as true the following state of facts:

"That from about 1823 the most of the parties named in the original petition to Tome, their children, heirs, and assigns, have settled the towns of Casa Colorado, San Juan, and Nutrias, all of which lie within the exterior boundaries of the Casa Colorado grant as patented, and during that time said persons have cultivated the arable lands along the Rio Grande river, where they lived, and have continued to do so to this time, at and between the said towns, all of which are on the east bank of the river, and during that time they have used the uplands, which are dry grazing lands, as a pasture for their animals, which use has been by all such persons, and that the land in controversy is such grazing land the western boundary of which is about three miles from the settlements, east thereof; that none of said persons have actually lived on the grazing lands at any time, and none of them have any paper title thereto, except such as they claim comes to them from or by reason of their being heirs or assigns of the original parties mentioned in the Casa Colorado petition; that the land in controversy was fenced during 1917 by Bivins, and that from that time through the time when Pru claims to have held the title, and during the time Yeast has held deeds thereto, the land has been under fence continuously by such claimants Bivins, Pru, and Yeast; that Bivins built a house thereon, and expended other moneys in fencing the land; that Pru built further improvements and that he expended considerable sums of money in improvements, and Yeast has further improved the property by the expenditure of several thousands of dollars before the state court foreclosure was begun; that up to the time of the foreclosure suit in the state court the cross-complaining defendants never demanded of any person that they vacate the said lands.

"This stipulation shall be taken as binding all parties to this suit, without prejudice to either of them to offer evidence in addition hereto and not in conflict herewith.

"[Signed]   Marron & Wood,
                "Attorneys for Plaintiff.
"[Signed]   John F. Simms and Harold Hurd,
                "Attorneys for Pru.
"[Signed]   H. B. Jamison,
                "Attorney for Cross-Complaining Defendants as a Class."

Issue was duly joined in the ejectment action, and it was set for trial in this court. When the case was called for trial, the plaintiffs asked that it be continued until the determination of this suit. The Prus, defending for Yeast, insisted on a trial. The court directed the trial to proceed. Thereupon the plaintiffs dismissed the ejectment action.

[1] The plaintiff and the individual defendants who are claimants of interests in the Casa Colorado grant contend that the Belen grant and Casa Colorado grant are individual and not community or town grants, and that therefore the title to the land in controversy in this suit never vested either in the town of Belen or the town of Casa Colorado; that the judgment in the district court of Valencia county in the case of Board of Trustees of the Belen Grant, Plaintiff, v. Board of Trustees of the Town of Casa Colorado Land Grant and Others, Defendants, No. 1766, in no way bound the individual claimants of the Casa Colorado grant; and that the purported conveyances of the board of trustees of the Belen grant were ineffectual, for the reason that the title was vested in the heirs and assigns of the persons to whom the grants were originally made. On the foregoing the plaintiff bottoms his principal contention that there was a breach of the covenant of seizin in the Pru deed to Yeast.

On the other hand, the defendants Pru, individually and as administrator, the board of trustees of the town of Casa Colorado land grant, and the board of trustees of the town of Belen land grant contend that the Act of Congress of December 22, 1858, confirming these two grants to Casa Colorado and Belen, respectively, as community or town land grants, was a conclusive adjudication both of the validity and the character of the grants, and not subject to review by the courts.

The nature and effect of the confirmatory act of Congress confirming to Belen the Belen grant and to Casa Colorado the Casa Colorado grant, are clearly shown by the decisions of the United States Supreme Court in the cases of Boquillas Land & Cattle Co. v. Curtis, 213 U. S. 339, 29 Sup. Ct. 493, 53 L. Ed. 822, and Los Angeles Farming & Milling Co. v. Los Angeles, 217 U. S. 217, 30 Sup. Ct. 452, 54 L. Ed. 736. In Boquillas, etc., v. Curtis, supra, the court said:

"The plaintiff draws another argument from the effect of the United States patent. It contends that the patent, not only confirms the Mexican title, but releases that of the United States (Beard v. Federy, 3 Wall. 478, 491), and that by the grant from the United States it gained rights as a riparian proprietor that could not be displaced by a subsequent attempt to appropriate the water. Sturr v. Beck, 133 U. S. 541. But while it is true that in Beard v. Federy, supra, Mr. Justice Field calls such a patent a quitclaim, we think it rather should be described as a confirmation in a strict sense. 'Confirmation is the approbation or assent to an estate already created, which, as far as is in the confirmer's power makes it good and valid; so that the confirmation doth

not regularly create an estate, but yet such words may be mingled in the confirmation, as may create and enlarge an estate; but that is by force of such words that are foreign to the business of confirmation.' Gilbert, Tenures, 75. It is not to be understood that, when the United States executes a document on the footing of an earlier grant by a former sovereign, it intends or purports to enlarge the grant. The statute under which the Mexican title was decided to be good speaks of confirmation throughout, and, in the most pertinent passage, directing a patent to be issued, says that it shall be issued 'to the confirmee.' Act of March 3, 1891, c. 539, § 10. 26 Stat. 854, 859. It would be possible, perhaps, to argue to the contrary from provisions in sections 8 and 13, that the confirmation shall only work a release of title by the United States, but we are satisfied that the true intent of the statute and the reason of the thing are as we have said."

In Los Angeles, etc., v. Los Angeles, supra, the court said:

"The Act of March 3, 1851 (chapter 41, § 14, 9 Stat. 631, 634), made provision for the presentation to the commission of the former right of pueblos and the issue of patents to them upon confirmation. And, further, the same section provided that the existence of a city, town, or village on July 7, 1846, being duly proved, should be prima facie evidence of a grant to such corporation.

"This court, speaking by Mr. Justice Miller, tersely disposes of the nature of such old Mexican titles in Adam v. Norris, 103 U. S. 591, 593:

"'But the United States, in dealing with parties claiming, under Mexican grants, lands within the territory ceded by the treaty of Mexico, never made pretense that it was the owner of them. When, therefore, guided by the action of the tribunals established to pass upon the validity of these alleged grants, the government issued a patent it was in the nature of a quitclaim— an admission that the rightful ownership had never been in the United States, but had passed at the time of the cession to the claimant, or to those under whom he claimed. This principle has been more than once clearly announced in this court. The leading cases are Beard v. Federy, 3 Wall. 478; Henshaw v. Bissel, 18 Wall. 255; Miller v. Dale, 92 U. S. 473.'

"It is perhaps more accurate to say that the action of the United States in such cases is a confirmation rather than a quitclaim. Boquillas Land & Cattle Co. v. Curtis, 213 U. S. 339, 344."

The duty of providing the mode for securing and establishing Spanish and Mexican land titles and fulfilling the treaty of Guadalupe Hidalgo devolved upon the political department of the government. Tameling v. U. S. Freehold & Emigration Co., 93 U. S. 644, 23 L. Ed. 998; Botiller v. Dominguez, 130 U. S. 238, 9 Sup. Ct. 525, 32 L. Ed. 926; Astiazaran v. Santa Rita Land & Mining Co., 148 U. S. 80, 13 Sup. Ct. 457, 37 L. Ed. 376. Congress could either discharge that duty itself or delegate it to the judicial department. In New Mexico, Congress by the Act of 1854, 10 Statutes at Large, 308, chose with the aid of the surveyor general to perform that duty itself.

The action of Congress, when taken, was conclusive and not subject to review by the courts. In Astiazaran v. Mining Co., supra, the court said:

"By article 8 of the Treaty of Guadalupe Hidalgo, and article 5 of the Gadsden Treaty, the property of Mexicans, within the territory ceded by Mexico to the United States, was to be 'inviolably respected,' and they and their heirs and grantees were 'to enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States.' 9 Stat. 929, 930; 10 Stat. 1035.

"Undoubtedly private rights of property within the ceded territory were not affected by the change of sovereignty and jurisdiction, and were entitled to protection, whether the party had the full and absolute ownership of the

land, or merely an equitable interest therein, which required some further act of the government to vest in him a perfect title. But the duty of providing the mode of securing these rights, and of fulfilling the obligations imposed upon the United States by the treaties, belonged to the political department of the government; and Congress might either itself discharge that duty, or delegate it to the judicial department. De la Croix v. Chamberlain, 12 Wheat. 599, 601, 602; Chouteau v. Eckhart, 2 How. 344, 374; Tameling v. United States Freehold Co., 93 U. S. 644, 661; Botiller v. Dominguez, 130 U. S. 238.

"For the adjustment and confirmation of claims under grants from the Mexican government of land in New Mexico, and in Arizona, which was formerly a part of it, Congress had not, when this case was decided below, established a judicial tribunal, as it had done in California, and as it has since done in New Mexico and Arizona by the Act of March 3, 1891, c. 539, 26 Stat. 854.

"But Congress reserved to itself the determination of such claims, and enacted that the surveyor general for the territory, under the instructions of the Secretary of the Interior, should ascertain the origin, nature, character, and extent of all such claims, and for this purpose might issue notices, summon witnesses, administer oaths, and do all other necessary acts, and should make a full report on such claims, with his decision as to the validity or invalidity of each under the laws, usages, and customs of the country before its cession to the United States, and that his report should be laid before Congress for such action thereon as might be deemed just and proper, with a view to confirm bona fide grants, and to give full effect to the treaty of 1848 between the United States and Mexico. Acts of July 22, 1854, c. 103, § 8, 10 Stat. 309, and July 15, 1870, c. 292, 16 Stat. 304.

"In Tameling v. United States Freehold Co., above cited, it was therefore held that the action of Congress, confirming, as recommended by the surveyor general for the territory, a private land claim in New Mexico, was conclusive evidence of the claimant's title, and not subject to judicial review; and Mr. Justice Davis, in delivering the opinion of the court, said: 'No jurisdiction over such claims in New Mexico was conferred upon the courts; but the surveyor general, in the exercise of the authority with which he was invested, decides them in the first instance. The final action on each claim, reserved to Congress, is, of course, conclusive, and therefore not subject to review in this or any other forum. It is obviously not the duty of this court to sit in judgment upon either the recital of matters of fact by the surveyor general, or his decision declaring the validity of the grant. They are embodied in his report, which was laid before Congress for its consideration and action.' 93 U. S. 662. See, also, Maxwell Land Grant Case, 121 U. S. 325, 366, and 122 U. S. 365, 371.

"The action of Congress, when taken, being conclusive upon the merits of the claim, it necessarily follows that the judiciary cannot act upon the matter while it is pending before Congress; for if Congress should decide the same way as the court, the judgment of the court would be nugatory, and if Congress should decide the other way, its decision would control."

In the case of Reilly v. Shipman (C. C. A.) 266 Fed. 852, the effect of the confirming Act of Congress of June 21, 1860, 12 Stat. 71, confirming the Anton Chico land grant, upon the right of the courts to inquire into the nature of the grant was before the Circuit Court of Appeals of the Eighth Circuit. Speaking through Circuit Judge Stone, the court said:

"The contentions of the plaintiff are that the original grant from the Mexican government in 1822 was to the grantees as individuals; that the patent issued in 1883 in conformity with the confirming Act of Congress of June 21, 1860 (12 Stat. 71), was to the original grantees as individuals, and inured to their successors in title; that his title deraigns directly from such grantees; that he or his predecessors in title have been in adverse possession claiming title for more than 10 years. The contentions of the defendants are that the

original grant was not to individuals as such, but to a community or town; that the confirming act of 1860 was to the inhabitants of Anton Chico as a community; that the patent is to the patentees as a community, but, if not, it is a nullity, as the act must control; that plaintiff's title is not deraigned from the original grantees; that there has been no sufficient adverse possession; that plaintiff is estopped and barred from claiming title by an adjudication of this title in the state courts. * * *

"(1) The first matter to be considered is the character of title, whether individual or community, of the original grant, as well as the effect thereon of the subsequent confirmatory act of 1860, and the patent issued thereon in 1883."

The court then proceeds to set out the history of the title up to and including the act of Congress, with an outline of the patent, and concludes that the act confirmed the title to the individuals as inhabitants of the town of Anton Chico, and therefore confirmed the grant as a town grant and not an individual grant. The court next takes up the effect of this confirmation by Congress, and says:

"What effect has such confirmation upon any contrary claim which appellant might base upon a construction of the original granting instruments or facts in connection therewith? In a case involving a New Mexican grant confirmed by this same act and section, the Supreme Court said:

" 'The final action on each claim reserved to Congress is, of course, conclusive, and therefore not subject to review in this or any other forum. It is obviously not the duty of this court to sit in judgment upon either the recital of matters of fact by the surveyor general or his decision declaring the validity of the grant. They are embodied in his report, which was laid before Congress for its consideration and action.' Tameling v. U. S. Freehold & Emig. Co., 93 U. S. 644, 662, 23 L. Ed. 998.

"We are clearly concluded from going back of the confirmation of Congress."

It appears to me that this case is directly in point in the instant case, and clearly upholds the contentions made by Pru and the trustees of Belen and Casa Colorado. While I am of the opinion that to hold that the act of 1858 confirming these grants as community or town grants is a conclusive determination both as to the validity and the character or nature of the grants which is not subject to review by the courts is consonant both with authority and reason, I am also of the opinion that if inquiry were made back of the confirmation of Congress as to the nature of these grants, the court would be bound to conclude against the contentions of plaintiff and the individual claimants of the Casa Colorado grant, for the reasons which I will now proceed to state.

Plaintiff and the individual claimants tendered in evidence as Exhibit 11 (originally 4) a Spanish archive on file in the office of the surveyor general of New Mexico, purporting to be a petition to the Spanish governor by Pedro Romero and others, setting up that so much of the lands granted to Belen as lay east of the river had never been settled or occupied, and that the petitioners were in need of lands for settlement, cultivation, and grazing, and asked that the said lands originally granted to Belen be granted to them. The governor referred the petition to the chief alcalde of Albuquerque. On the 7th of February, 1764, the alcalde made his report, stating that he had called together the inhabitants of Belen, and that all were present with the exception of five, who had gone to the old country, and that those present said that the new settlement of Las Nutrias was proper; that although the land had been granted to them by his majesty, as it was for com-

mon benefit, they would yield their rights to the same. The alcalde in his report recommended that the grant be made to the settlement of Las Nutrias. Following this report the governor on February 17, 1764, purported to make a grant to Las Nutrias upon condition that they build the settlement united with the town and not extend the settlement into ranches, but withheld the giving of juridical possession until the conditions of the grant were complied with.

On March 27, 1771, the governor entered an order purporting to revoke this grant, for the reason that the settlers had not complied with the conditions of the grant. In the order of revocation the governor undertook to declare the lands theretofore conditionally granted to Las Nutrias to be royal public lands. See Plaintiff's and Individual Claimants of Casa Colorado's Grant Exhibit 5. If the grant was originally made to the settlers of Belen as individuals, and was relinquished by them at the time of the conditional grant to Las Nutrias, and on the revocation of the grant to Las Nutrias became public domain, then so far as Belen is concerned it remained so up to the time of the confirmation thereof by the act of Congress to Belen. On account of the facts above set out, the plaintiff and said individual claimants contend that the land in question immediately prior to the grant to Casa Colorado was public domain. I do not so decide, but, if such be true, it becomes immaterial, under the theory of the case as presented by plaintiff and the said individual defendants, to determine whether the original grant to Belen was a community grant or an individual grant, the only title which Belen ever acquired to the lands in controversy being that given by the act of Congress which confirmed the grant, not to individuals, but to the town of Belen.

[2] Was the grant to Casa Colorado an individual or community grant? The archive in connection with this grant appears as Plaintiff's Exhibit 2. First appears the names of the settlers of Casa Colorado, and then the following:

"To the Most Illustrious Corporation of Tome:

"The citizen Jose Maria Perea, for himself, and in the name of the settlers of Manzano, who are set forth in the margin, with due respect represent to your excellencies that the most excellent provincial deputation of this territory, in compliance with the provisions of article sixteenth of the decree of the 23d of June, 1813, having ordered that the inhabitants who are scattered over the hills and valleys shall be reduced to settlements, in conformity with the provisions of the laws, and your excellencies having complied with the requirements of its excellency, and in order that we may hold the lands given to us for cultivation and settlement in fee, we pray your excellencies to place us in the full possession thereof, specifying the boundaries of the land we are occupying at the point called Casa Colorado, fixing our boundaries from north to south, from the boundary of the jurisdiction of Tome to the ruins of what is known as the old settlement of Las Nutrias, and on the east, the commons which may be necessary for pastures and other common purposes, highways, and rights necessary to every settlement established upon the solid principles of common and private property, and actual settlements, praying that any one of those herein subscribed, or any other person, without injury to these who may be admitted to the new settlement of Casa Colorado, may acquire a title in fee upon the construction of a covered house of adobe, and the removal thereto of all his property, contributing to the common labor, encouraging the increase and progress of the settlement, defending the homes of his townsmen with arms at all hazards and against any enemy from within or from the exterior, and, lastly, that any one who does not reside in

said town, with all his proper family, or residing in any other settlement, he shall forfeit the right he has acquired to said property; in view of all which we jointly and severally pray your excellencies, through a committee from your body, to direct that the boundaries be established at the points herein referred to, which being done, that we be compelled to establish the landmarks required for the guidance of all settlements and towns in the province, granting us said lands in the name of the supreme government of the Mexican nation, to which the individuals herein represented belong. Forwarding the proceedings thereon had to the most excellent provincial deputation, in order that its excellency may issue the proper approval thereof, costs, protests, and whatever may be necessary. Tome, July 12, 1823, third of the independence and second of liberty.

"To the Most Illustrious Corporation of Tome.

"[Signed] Jose Maria Perea.

"Hall of the Corporation of Tome.

"July 15, 1823.

"As requested by petitioners, this corporation has directed that a committee from its midst shall point out to them the boundaries they ask to their lands which have been given to them in the name of the supreme government of the nation, forwarding the same officially to the most excellent provincial deputation of this territory for its customary approval.

"[Signed] Bartolome Baca.

"Office of the Secretary of the Provincial Deputation of New Mexico.

"In session of the 30th of July last, this deputation approved the foregoing proceedings relative to the grant of land made by the corporation of Tome to the residents of Manzana, at the place known as the Casa Colorado. Given at Santa Fé, on the 15th day of the month of September, 1823, 3d and 2d, I certify. [Signed] Juan Bautista Vigil, Acting Secretary."

It will be noted that this contemplates a settlement in a town; that not only the persons who join in the petition may be admitted to the settlement, but that any other person who may be admitted to the new settlement of Casa Colorado may acquire a title in fee upon the construction of a covered house of adobe, the removal thereto of all his property, and by contributing to the common labor, encouraging the increase and progress of the settlement, and defending the homes of his townsmen; that any one who does not reside in the town with his family, or resides in any other settlement, shall forfeit the right he has acquired; and that it provides for commons for necessary pastures and other common purposes. The title in fee applies, of course, only to the individual tracts assigned to each settler, and not to the commons for pastures and other common purposes.

In the case of U. S. v. Sandoval, 167 U. S. 278, at page 295, 17 Sup. Ct. 868, 874 (42 L. Ed. 168), the court said:

"The papers in the expediente show that it was the intention that a town or pueblo should be, and that it was, established. The application stated that the land asked for was intended not only for the fifty-one petitioners, 'but also every one in the province not supplied.' The alcalde Ortiz was directed to execute the grant on 'the conditions and requisites required in such cases to be observed'; the conditions are set out by the alcalde in his report as all agreed to by petitioners, among them being the provision that the tract was to 'be in common, not only in regard to themselves, but also to all the settlers who may join them in the future.'

"In 1803, the alcalde Pino, under instructions from the governor, went upon the grant and divided the lands which had been occupied and cultivated amongst the original petitioners and some others, and put each one in the possession of the lot drawn by him, notifying them that no one should have

292 F.—39

the right to sell the land allotted to him until the expiration of ten years from that date, as directed by the governor. The grant purported to convey only the use of the lands, with the right to acquire the legal title to such portion of it as might be allotted to each in severalty, on condition that they remained on it and cultivated it for ten years, while the unoccupied or common lands were declared to be for the benefit of the original grantees and all other persons who might desire to settle on the grant, and who complied with the terms in regard to settlement and cultivation."

Under the authority of this case, if we look to the language contained in the documents in connection with the Casa Colorado grant, we must conclude that an attempt was made by the ayuntamiento, with the approval of the territorial deputation, to make a community grant to the settlers of Manzano at a point called Casa Colorado.

Counsel for plaintiff and the individual claimants of the Casa Colorado grant contend that this grant was made under the authority of the decree of June 23, 1813, and the decree of January 4, 1813. These decrees appear in Reynolds' Spanish and Mexican Land Laws at pages 83 to 88, inclusive, and are as follows:

"Decree of January 4, 1813.

"On reducing the vacant and other common lands to private ownership: Tracts granted to the defenders of the country and to citizens who are not proprietors.

"The general and extraordinary Cortes, considering that the reduction of the *common lands* to private ownership is one of the measures that the welfare of the towns and the development of agriculture and industry most demand, and desiring at the same time to afford assistance to the public needs, with this class of land, a reward to the worthy defendants of the country and help to those citizens who are not proprietors, decrees:

"I. All public or crown lands, and those of the municipal domains and revenues with woodland or without, both in the peninsular and adjacent islands and in the provinces beyond the sea, except the necessary commons of the towns, shall be reduced to private ownership, care being taken in the case of those of municipal domains and ownership that their annual revenues be supplied by the most timely means, which, on the proposal of the provincial deputations, shall be approved by the Cortes.

"II. In whatever manner these lands are distributed, it shall be with full rights of property and by boundaries, in order that their owners may fence them (without prejudice to valleys, cross-roads, watering places and servitudes), enjoy them freely and exclusively, and assign them to the use or cultivation that may be most convenient to them; but they shall never entail them, nor at any time nor by any title transfer them in mortmain.

"III. In the alienation of said lands the residents of the towns, within the limits of which they are situated, and the joint holders in the enjoyment of said public lands shall be preferred.

"IV. The provincial deputations shall propose to the Cortes, through the regency, the time and the terms in which it may be most convenient to carry out this provision in their respective provinces, according to the circumstances of the country, and the lands it may be indispensable to preserve for the towns, that the Cortes may decide what is best adapted for each territory.

"V. This matter is recommended to the zeal of the regency of the kingdom and to that of the offices of the two secretaries of government, that they may promote it and enlighten the Cortes when they forward to it the estimates of the provincial deputations.

"VI. Notwithstanding what is provided the half of the public and crown lands of the monarchy, excepting town commons, are reserved, in order that wholly or in part that may be considered necessary, they may serve as a mortgage for the payment of the national debt, and preferably for that of the credits the residents of the towns to which the lands belong hold against

the nation, and among these credits the first place shall be given to those that were incurred for supplies for the national armies or war loans, which said residents may have made since May 1, 1808.

"VII. When this half of the public and crown lands is alienated, or the part it may be considered necessary to hypothecate, the residents of the respective towns and the joint holders in the enjoyment of said lands shall be preferred, and in the case of both the properly liquidated credits they may hold for said supplies and loans shall be received in payment at their full value, and, in the absence thereof, any other legitimate national credits they may have.

"VIII. In said half of the public and crown lands, there must be included and computed the part that has already been justly and legally alienated, in some of the provinces, for the expenses of the present war.

"IX. Of the remaining public and crown lands, or of the farming lands of the municipal domains and revenues, a tract of those most suitable for cultivation shall be given to every captain, lieutenant or sublieutenant, who, because of his advanced age, or because he has been disabled in the military service, may retire with proper authority, without dishonor, and with proper documents to show his honorable service; and the same to every sergeant, corporal, soldier, trumpeter and drummer, who, for the same reasons, or because he has served out his time, obtains his final discharge without bad character, whether the one or the other be citizens or foreigners: Provided, there be lands of this class in the districts where they fix their residence.

"X. The tracts that are given to officers and soldiers in every town shall be equal in value in proportion to the quantity and character of the same, and greater or less in some countries than in others, according to the character of the lands and according as there is a small or large amount thereof.

"XI. The allotment of these tracts shall be made by the constitutional common councils of the towns to which the lands belong, as soon as the parties in interest file with them the documents that show their good service and retirement, and the town attorneys shall be heard briefly and administratively in everything and without costs or fees of any kind being required. The proceedings shall then be forwarded to the provincial deputation that it may approve it and repair any grievance.

"XII. The grant of these tracts, which shall be called patriotic reward, shall not be extended for the present to any other individuals than those who serve or may have served in the present war, or in the pacification of the actual disturbances in some of the Provinces beyond the sea. But it includes the captains, lieutenants, sublieutenants and troops, who, having served in one or the other, have retired without dishonor and with proper authority, because they have been disabled or incapacitated in action in war, and in no other way.

"XIII. It also includes individuals not in the military service, who, having served in detachments or contributed in any other way to the national defense in this war, or in the disturbances in America, have been or may be disabled or incapacitated as the results of action in war.

"XIV. These favors shall be granted to the subjects referred to, although they may be in the enjoyment of other rewards for the services and actions mentioned.

"XV. Of the same remaining public and crown lands those most appropriate for cultivation shall be parceled out, and to every resident of the respective towns that asks for it and has no other land of his own, there shall be given gratuitously and by lot, and for once a tract in proportion to the amount of lands, provided the total of lands thus distributed shall not in any case exceed the fourth part of said public and crown lands; and if the latter are not sufficient, the tract shall be given from the farming lands of the municipal domains and revenues, and in such case a redeemable rent (canon) shall be imposed upon it equivalent to the revenue from the same for the five years to the end of 1817, in order that the municipal funds may not fall off.

"XVI. If any of those favored by the preceding article should, for two consecutive years, fail to pay the rent, the tract being part of the municipal

domains, or held on lease, it shall be given to another more industrious resident who has no land of his own.

"XVII. The proceedings on these grants shall also be had by the common councils without cost and the provincial deputations shall approve them.

"XVIII. All the tracts granted under articles IX, X, XII, XIII, and XV, shall be with full rights of property for the grantees and their successors in the terms and with the faculties expressed in article II; but the owners of these tracts shall not alienate them before four years from the time they were granted, nor ever subject them to entail nor transfer them at any time or by any title in mortmain.

"XIX. Any of said grantees or their successors who establishes his permanent residence on said tract shall be exempt for eight years from every tax or impost on that land or its products.

"XX. This decree shall be circulated not only in all the towns of the monarchy, but also among all the national armies, and shall be so published in all of them as to come to the notice of all the individuals that compose them."

"Decree of June 23, 1813.

"Instructions for the Politico-Economic Government of the Provinces.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Chapter II.

"Obligations and Duties of the Provincial Deputations.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"XVI. Besides what is provided in paragraph 10 of article 335 of the Constitution, the deputations beyond the sea shall see that the inhabitants dispersed in the valleys and mountains, in places where that occurs, are induced to live in settlements, pursuant to the provisions of the laws, and they shall propose to the government the measures they consider best adapted to furnishing them lands and the means of cultivating them, in accordance with what was provided by the Cortes in the decree of January 4th of this year.

"XVII. Inasmuch as the provincial deputations shall consult the government, await its authorization for all its acts, where the law requires this requisite, and in general in all those cases and measures of great importance, all its applications and communications shall be directed through the channel of the political chief, its president."

The petition to the corporation of Tome and the other papers mention only the decree of June 23, 1813. It will be noted that this decree confers no authority upon the deputations to grant lands to the inhabitants dispersed in the valleys and mountains, but only directs them to induce such inhabitants to live in settlements and to propose to the government the measures they consider best adapted for furnishing them lands.

The decree of January 4, 1813, clearly applies only to the common lands assigned to towns. In support of this conclusion I call attention to certain provisions of the decree.

It commences by saying that the "Cortes, considering that the reduction of the common lands to private ownership is one of the measures that the welfare of the towns and the development of agriculture and industry most demands, etc., decrees." The matter under consideration was the common lands assigned to the towns. In the body of the decree we find the following:

Section 1: "All public or crown lands except the necessary commons of the towns shall be reduced to private ownership, care being taken in the case of those municipal domains and ownership that their annual revenues be supplied by the most timely means."

Section 3: "In the alienation of said lands the residents of the towns within the limits of which they are situated and the joint holders in the enjoyment of said public lands shall be preferred."

This clearly refers to lands within towns which have been assigned to such towns as community or pueblo lands.

Section 6: "And preferably for that of the credits the residents of the towns to which the lands belong hold against the nation."

Section 7: "When this half of the public and crown lands is alienated * * * the residents of the respective towns and the joint holders in the enjoyment of said lands shall be preferred."

Section 9: "Of the remaining public and crown lands or of the farming lands of the municipal domains and revenues a tract of those most suitable for cultivation shall be given to every captain, lieutenant or sublieutenant," etc.

Section 10: "The tracts that are given to officers and soldiers in every town shall be equal in value," etc.

Section 11: "The allotment of these tracts shall be made by the constitutional common councils of the towns to which the lands belong. * * * The proceedings shall then be forwarded to the provincial deputation that it may approve it and repair any grievance."

It clearly appears that this decree refers exclusively to lands which under the Spanish and later the Mexican custom were assigned to the towns as common lands. This seems to be the construction placed on this decree by the Supreme Court of the United States in U. S. v. Santa Fé, 165 U. S. 675 (see opinion top of page 710), 17 Sup. Ct. 472, 41 L. Ed. 874.

The character of these common lands is discussed by the Supreme Court of the United States in the case of Grisar v. McDowell, 73 U. S. (6 Wall.) 363, commencing at page 372 (18 L. Ed. 863), as follows:

"By the laws of Mexico, which prevailed in California at the date of the conquest, pueblos or towns, when once established and officially recognized, were entitled for their benefit and the benefit of their inhabitants, to the use of lands, embracing the site of such pueblos or towns, and of adjoining lands within certain prescribed limits. This right, as we observed in Townsend v. Greeley, 5 Wall. 336, appears to have been common to the cities and towns of Spain from an early period in her history, and was recognized in the laws and ordinances for the settlement and government of her colonies on this continent. The same general system of laws for the establishment and government of pueblos, and the assignment to them of lands that prevailed under Spain, was continued in Mexico, with but little variation, after her separation from the mother country. These laws provided for the assignment to the pueblos, for their use and the use of their inhabitants, of land not exceeding in extent four square leagues. Such assignment was to be made by the public authorities of the government upon the original establishment of the pueblo, or afterwards upon the petition of its officers or inhabitants: and the land was to be measured off in a square or prolonged form, according to the nature and condition of the country. All lands within the general limits stated, which have previously become private property, or were required for public purposes, were reserved and excepted from the assignment.

"Until the lands were thus definitely assigned and measured off, the right or claim of the pueblo was an imperfect one. It was a right which the government might refuse to recognize at all, or might recognize in a qualified form; it might be burdened with conditions, and it might be restricted to less limits than the four square leagues, which was the usual quantity assigned. Even after the assignment the interest acquired by the pueblo was far from being an indefeasible estate such as is known to our laws. The purposes to be accomplished by the creation of pueblos did not require their possession of

the fee. The interest, as we had occasion to observe in the case already cited, amounted to little more than a restricted and qualified right to alienate portions of the land to its inhabitants for building or cultivation, and to use the remainder for commons, for pasture lands, or as a source of revenue, or for other public purposes. And this limited right of disposition and use was in all particulars subject to the control of the government of the country."

And again, in U. S. v. Santa Fé, supra, commencing at page 707 of 165 U. S., at page 484 of 17 Sup. Ct. (41 L. Ed. 874), where the court said:

"It cannot be doubted that under the law of Spain it was necessary that the proper authorities should particularly designate the land to be acquired by towns or pueblos, before a vested right or title to the use thereof could arise. Thus, by law 7, book 4, title 7, of the recopilacion, which regulated the mode of distribution of a tract granted by agreement to a founder of a settlement, it was provided as follows (2 White, New Recop. p. 46):

"'The tract of territory granted by agreement to the founder of a settlement shall be distributed in the following manner: They shall, in the first place, lay out what shall be necessary for the site of the town and sufficient liberties (exidos) and abundant pasture for the cattle to be owned by the inhabitants, and as much besides for that which shall belong to the town (propios). The balance of the tract shall then be divided into four parts; one to be selected by the person obligated to form the settlement, and the remaining three parts to be divided in equal portions among the settlers.'

"Law 11 of the same book and title, provides also (2 White, New Recop. p. 46):

"'The lots shall be distributed among the settlers by lot, beginning with those adjoining the main square, and the remainder shall be reserved to us, to give, as rewards, to new settlers, or otherwise, according to our will; and we command that a plan of the settlement be always made out.'

And law 12 of the same book and title declares (2 White, New Recop. p. 47):

"'We command that no houses be erected within the distance of three hundred paces from the walls or breastworks of the town, this being necessary for the good of our service and for the safety and defence of the towns, as provided with regard to castles and fortresses.'

"And it is well to notice at this point that Santa Fé was a fortified town; it possessed a castle, and not only the land upon which it was erected but a considerable extent of land surrounding it was in any view a part of the public domain, and passed as such to the United States. Mitchel v. United States, 15 Pet. 52, 89, 91.

"The Spanish understanding of the prerequisite designation is well illustrated by the following passages from Elizondo's Practica Universal Forense.

"At vol. 3, p. 109, he says:

"'The kings, the fountains of jurisdictions, are the owners of all the terminos situated in their kingdoms, and as such can donate them, divide or restrict them, or give any new form to the enjoyment thereof, and hence it is that the pueblos cannot alienate their terminos and pastos without precedent royal license and authority.'

"And at volume 5, p. 226, he says:

"'There is nothing whatever designated by law as belonging to towns, other than that which by royal privilege, custom or contract between man and man, is granted to them, so that although there be assigned to the towns at the time of their constitution a territorio and pertinencias, which may be common to all the residents, without each one having the right to use them separately, it is a prerogative reserved to the princes to divide the terminos of the provinces and towns, assigning to these the use and enjoyment, but the domain remaining in the sovereigns themselves.'

*          *          *          *          *

"Moreover, the general theory of the Spanish law on the subject indicates that, even after a formal designation, the control of the outlying lands, to which a town might have been considered entitled, was in the king, as the

source and fountain of title, and could be disposed of at will by him or by his duly authorized representative, as long as such lands were not affected by individual and private rights. This is shown by the quotation from Elizondo, already made. The provisions of law 14, title 12, book 4, of the Recopilacion (2 White, New Recop. p. 52), which is reproduced in the margin, illustrates the absolute control thus exercised by the king of Spain over the subject.

"The existence of this power of control and disposition as to municipal lands in the supreme Spanish authority finds a further and cogent exemplification in the decree of the Cortes of January 4, 1813, referred to by Hall in his Mexican Law, p. 45. A like power, it is to be inferred, is now asserted to be lodged in and has actually been exercised by the general government of Mexico. The Constitution of Mexico of February 5, 1857, which went into effect September 16 of the same year, prohibited the acquisition or administration of real property by civil or ecclesiastical corporations without any other exception than the buildings intended immediately or directly for the service or purpose of the institutions, and hence arose the necessity for the abolition of municipal commons (exidos) in order to comply with this constitutional provision. In discussing the subject, Orozco, a Mexican writer, in his 'Legislation and Jurisprudence on Public Lands' (vol. 2, p. 1107), after pointing out the distinction between pueblo sites (fundo) and the ejidos or commons of a pueblo, says:

"'The municipal commons (ejidos), as has been seen, were excluded by the laws abolishing mortmain; but, in view of the aforesaid constitutional precept, it was logical to infer that the municipal commons (ejidos) passed to the control of the federal treasury, as successor by subrogation of the property of corporations, and with so much the more reason since, recalling the origin of the municipal commons (ejidos) as soon as their existence became impossible, nothing is more natural and consequential than that those lands should revert to the dominion of him who granted them for the common use of the residents of the settlements.'"

Thus it appears that while under both the Spanish and Mexican laws it was the custom in cases of community or town grants (and Tome was a town grant, see Bond v. Unknown Heirs of Barela, 229 U. S. 488, 33 Sup. Ct. 809, 57 L. Ed. 1347), to give to pueblos or towns when once established and officially recognized for their benefit and the benefit of their inhabitants the use of lands embracing the site of such pueblos or towns and of adjoining lands within certain prescribed limits, yet until the lands were definitely assigned and measured off the right or claim of the town was an imperfect one, and a right which the government might refuse to recognize at all, or might recognize in a qualified form.

We must therefore conclude that the decree of June 23, 1813, gave no authority to the ayuntamiento to grant lands with the approval of the territorial deputation, other than that contained in the decree of January 4, 1813, which by its terms was expressly limited to the common lands which had been assigned to towns.

It affirmatively appears from the petition addressed to Tome that the northern boundary line of the land sought to be granted was the southern boundary of the jurisdiction of Tome, and not a part of the common lands assigned to the town of Tome, and therefore there was no authority in the town of Tome through its alcalde and ayuntamiento to grant or assign these lands to settlers either under the decree of January 4, 1813, or the general powers vested in the governing body of such a town to alienate portions of common lands, assigned and

measured off to it, to the inhabitants of such town for building or cultivation or recognized by the Supreme Court in Grisar v. McDowell, supra.

Counsel for plaintiff and the individual claimants of the Casa Colorado grant contend, however, that the power of the town of Tome to alienate land extended to adjacent lands and cite in support of this contention the cases of Merryman v. Bourne, 76 U. S. (9 Wall.) 592, 19 L. Ed. 683, Grisar v. McDowell, 73 U. S. (6 Wall.) 373, 18 L. Ed. 863, Palmer v. Low, 98 U. S. 1, 25 L. Ed. 60, Crespin v. U. S., 168 U. S. 208, 18 Sup. Ct. 53, 42 L. Ed. 438, and U. S. v. Santa Fé, 165 U. S. 713, 17 Sup. Ct. 472, 41 L. Ed. 874. We do not understand exactly what counsel mean by the term "adjacent lands." If counsel mean by this term lands in close proximity to the town, but not expressly assigned and measured off to the town, as explained in the quotations above set out, in the cases of Grisar v. McDowell and U. S. v. Santa Fé, supra, then we must disagree with their contention. On the other hand, if they refer to the town lands assigned and measured off to the town of Tome, the principle has no application, for the reason that it affirmatively appears that the Casa Colorado grant lay south of the boundary line of the jurisdiction of Tome, and was not within its assigned community lands.

There is another reason why there was no authority in the town of Tome on the date of the purported Casa Colorado grant, namely, July 15, 1823, to act at all. The independence of Mexico dated from February 24, 1821. On that date the kingdom of Spain lost its jurisdiction over what is now New Mexico and the sovereignty of the Mexican nation commenced. The colonization law of the Emperor Iturbide was adopted January 4, 1823. It was suspended by the decree of April 11, 1823, and was superseded by the law of August, 1824. The Casa Colorado grant was therefore made during the suspension of the Iturbide colonization law of January 4, 1823, and at a time when there was no law in force and effect authorizing the alienation of the public domain. See Stoneroad v. Beck, 16 N. M. 754, 120 Pac. 898; Leese v. Clarke, 3 Cal. 17, 23; More v. Steinbach, 127 U. S. 70, 71, 8 Sup. Ct. 1067, 32 L. Ed. 51.

[3] Counsel for the plaintiff and individual claimants of the Casa Colorado grant admit that the act of Congress confirming the grant effectually and finally determined the validity of the grant, so that the question of the validity thereof is not now open for review by the courts. They contend, however, that because of the following language in the act of Congress (11 Stat. 374):

"Provided, that this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist,"

—that inquiry may be had into the nature of the grant for the purpose of determining the rights of individual claimants. They strenuously contend in their brief that, since the power to grant town or community grants was vested solely in the governor, and the only power that ever existed in the town of Tome was to allot or set off in severalty the common lands belonging to the town to individuals for building sites and for cultivation, and since the grant in question emanated from the

town of Tome, the validity of the grant having been conclusively determined by Congress, it must be presumed that it was an individual grant.

The effect of this argument is this: Admitting there was no power in the town of Tome to make a grant of lands to a community or to grant lands lying beyond the jurisdictional limits of the town and not a part of its assigned community lands, and admitting that the grant in question was beyond the territorial jurisdiction of the town of Tome, and admitting that the decrees of 1813 and the general power of the ayuntamiento and territorial deputation to assign community lands had been suspended, yet the validity of the grant having been determined by Congress, and the grant having been confirmed as a community or town grant, and not an individual grant, that they may accept the benefits of the confirmation by Congress declaring the grant valid, and because of that confirmation look to a power vested in the town of Tome prior to the date of the Mexican independence, which power had been suspended because of that independence, and from the character of that particular power determine the nature or character of the grant. The fallacy of such an argument is patent on its face. If as to the validity of the grant the power of the authority from which it emanated is conclusively presumed, on what theory can it be inquired into in determining the nature of the grant? If the power to make the grant must be presumed to have existed, then it must be presumed to have existed to make the kind of grant that was made. If we can go back of the confirmation, and make an independent investigation of the nature of the grant, we examine, not the source or extent of the power from which it emanated, because that has been foreclosed by Congress, but, assuming there was authority to make the grant purported to have been made, we examine that grant itself, to determine its nature or character. When I do this I am bound to conclude, as the surveyor general and Congress did, that the grant to Casa Colorado was a community or town grant.

[4] There is another reason why the individual claimants should not be permitted to stand on the confirmation for the validity of the grant, and go back of that confirmation as to the character of the grant. Manifestly the Casa Colorado grant, prior to its confirmation by Congress, was an imperfect grant. See United States v. Sandoval, 167 U. S. 278, at pages 293, 294, and 295, 17 Sup. Ct. 868, 42 L. Ed. 168. The grant being imperfect, no other mode of establishing the same existed, except that provided by the act of 1854. U. S. v. Santa Fé, 165 U. S. 675, at 714, 715, and 716, 17 Sup. Ct. 472, 41 L. Ed. 874. By the eighth section of the act of 1854, the duty of ascertaining the *origin, nature, character, and extent* (italics are mine) of land grants in the territory of New Mexico was enjoined upon the surveyor general of that territory. The act empowered him for that purpose to issue notices, summon witnesses, administer oaths, and perform all other necessary acts in the premises, and directed him to make a full report with his decision on such claims to Congress. The final action on each claim was reserved to Congress.

Pursuant to this act the surveyor general for New Mexico proceeded to give notice that he would hear claims. Prior to December 5, 1856,

the town of Casa Colorado made application to the surveyor general for confirmation of the Casa Colorado land grant to the town. The case was heard on December 5, 1856. On December 31, 1856, the surveyor general made a favorable report recommending the confirmation of the grant to the town of Casa Colorado. The grant was confirmed to the town of Casa Colorado by the Act of December 22, 1858 (11 U. S. Stat. 374). The survey was made in 1877. Patent was issued July 26, 1909. In the early part of the year 1857 the town of Belen made application to the surveyor general for confirmation to it of the Belen grant. The case was heard March 8, 1857. The surveyor general made his report September 30, 1857,·and recommended the confirmation of the grant to the town of Belen.· It was confirmed to the town of Belen by the same Act of December 22, 1858. The survey was made in 1860. Patent was issued April 25, 1871. No steps were ever taken by any person claiming as an heir or successor in title to the original petitioners for either the Belen grant or Casa Colorado grant to establish any such claim before the surveyor general or any other tribunal, until this suit and the ejectment suit above referred to were commenced. We do not believe, after a lapse of more than 60 years, these claimants should be heard to say:

"For the purpose of establishing the validity of our title, we will take advantage of the acts of the town of Casa Colorado which established the validity and secured the confirmation of the title of the grant to the town, but will take that title from it, by disputing the character of the grant, and showing it was a different kind of a grant from the one confirmed and patented to the town of Casa Colorado."

These same observations are true as to Belen, except it was not a void grant originally.

I therefore conclude that the grant to Casa Colorado was a community or town grant.

[5] The lands in controversy in this suit were never occupied by the individual settlers, but according to the stipulation made in this case were unwatered and upland grazing lands, which were only used by the settlers in common for the grazing of their flocks. They were unallotted common lands. This being true, title to these lands remained in the government of Mexico, and was succeeded to by the United States as the successor of that government. U. S. v. Sandoval, 167 U. S. 278, at pages 296, 297, 17 Sup. Ct. 868, 42 L. Ed. 168; U. S. v. Santa Fé, 165 U. S. 675, at page 711, 17 Sup. Ct. 472, 41 L. Ed. 874; Bond v. Unknown Heirs of Barela, 229 U. S. 488, at pages 492, 493, 33 Sup. Ct. 809, 57 L. Ed. 1347.

When Congress confirmed the grant to the town of Casa Colorado, the title was vested in the town, free from any trust for the heirs or assigns of the original petitioners. In Bond v. Barela, 229 U. S. 488, at page 493, 33 Sup. Ct. 809, 811 (57 L. Ed. 1347), the court said:

"There was, however, congressional confirmation of the grant. In 1856 the inhabitants of Tome petitioned the surveyor general for New Mexico for confirmation of the grant to the town, conformably to the Act of July 22, 1854, 10 Stat. 308, c. 103. It was so confirmed by the Act of December 22, 1858, 11 Stat. 374, c. 5, and April 5, 1871, patent issued to the town of Tome.

It is said that the legal title so passed is subject to a trust for the heirs of the original petitioners, who, it is claimed, were beneficiaries of the decree of the Spanish governor in 1739.

"As no benefit of that decree, and no title to any of the land, passed to any of the petitioners save those to whom allotments were made, and only to the allotted tracts, no further discussion is necessary. When patent to the entire grant issued to the town of Tome, title to all the unallotted land passed from the United States to the town unburdened with any trust for heirs or grantees of persons named in the original petition and decree."

[6] The Las Nutrias papers were not of record. The New Mexico recording act (sections 4786, 4787, and 4788, New Mexico, Stat. Ann., Codification of 1915), required the recordation thereof. Sections 1, 2, 3, and 9 of this statute as originally enacted, being chapter 10 of the Session Laws of 1887, read as follows:

"Section 1. All deeds, mortgages, United States patents and other writings affecting the title to real estate, shall be recorded in the office of the probate clerk of the county or counties in which the real estate affected thereby is situated.

"Sec. 2. Such record shall be notice to all the world of the existence and contents of the instruments so recorded from the time of recording.

"Sec. 3. From and after the 1st day of January, 1888, no deed, mortgage or other instrument in writing, not recorded in accordance with the first section of this act, shall affect the title or rights to, in any real estate, of any purchase or mortgage in good faith, without knowledge of the existence of such unrecorded instruments. ＊ ＊ ＊

"Sec. 9. This act shall take effect on the 1st day of March, 1887."

It will be noted that the act contained a saving clause giving from March 1, 1887, to January 1, 1888, within which to record instruments as required in the act. The statute was therefore substantially the same as the Texas recording act, which was before the Supreme Court of the United States in the case of Airhart v. Massieu, 98 U. S. 491, 25 L. Ed. 213. The court in that case held that the Texas act applied to Mexican land grants, including the documents from the government of Mexico which were the basis of such grants.

The plaintiff, the Prus, and Bivins, had no actual notice of the Las Nutrias papers, and had no notice of facts which would put a purchaser on inquiry. They were therefore innocent purchasers for value without notice of the Las Nutrias papers. Airhart v. Massieu, supra; Miller v. Dale, 92 U. S. 473, 23 L. Ed. 735; Fletcher v. Peck, 6 Cranch, 87, 3 L. Ed. 162.

In so far as the plaintiff, the Prus, and Bivins had notice, at least, the Belen grant was superior to the Casa Colorado grant. Jones v. Cattle Co., 232 U. S. 355, 34 Sup. Ct. 419, 58 L. Ed. 636. Therefore the Prus conveyed a good title to plaintiff.

[7] Counsel for plaintiff and individual claimants of the Casa Colorado grant claim that the provisions of sections 799 to 817, inclusive, New Mexico Statutes Ann., Codification 1915, were not complied with in the election of the trustees for Casa Colorado. The several boards of trustees of Casa Colorado, during the time they purported to act as such, were in possession of the office of trustees under color of title thereto, and performed the duties attached to such office over a long period of time with the acquiescence and approval of the public. The

same is true of the boards of trustees that have purported to act for Belen. These boards were therefore de facto, if not de jure, boards. In re Rochester Sanitarium & Baths Co., 222 Fed. 22, 137 C. C. A. 560; Ex parte Ward, 173 U. S. 452, 19 Sup. Ct. 459, 43 L. Ed. 765; State v. Blancett, 24 N. M. 433, 174 Pac. 207. This would likewise be true, even if the towns were only de facto municipal corporations. 29 Cyc. 1391.

Because of the judgment in the state court, therefore, Belen had good title to the land in controversy in this suit, and the Prus as its successors by mesne conveyances conveyed good title to the plaintiff.

Finally, both the trustees of Casa Colorado and Belen are parties to this action, and by their answer have denied all the allegations of plaintiff's complaint, and have in effect disclaimed any claim to the land in controversy in this suit.

Because of the foregoing, I conclude that plaintiff and the individual claimants of the Casa Colorado grant have shown no facts entitling them, or either of them, to relief in a court of equity. A decree will be entered accordingly.